## THE FARIST STEEL COMPANY *vs.* THE CITY OF BRIDGE-PORT.

New Haven and Fairfield Cos., Jan. T., 1891. ANDREWS, C. J., CARPEN-TER, LOOMIS, SEYMOUR and TORRANCE, JS.

Although the fee of land between high and low water mark on the sea-shore is in the state, yet it seems to be the better opinion that the state cannot take it for public use without compensation.

But the question becomes unimportant where the charter of a city ex-pressly provides that compensation shall be made for such land taken by the city in establishing harbor lines.

The charter of the city of Bridgeport provided that after the common council had decided to establish a harbor line, it should appoint a com-mittee whose duty it should be to make the lay-out and report their doings in writing to the common council. The standing committee on harbor improvements reported to the council resolutions in favor of laying out certain harbor lines, and appointing a committee to lay them out, which resolutions the council adopted. The committee thus appointed reported and recommended a resolution for adoption by the council, laying out the harbor lines as proposed, which resolu-tion the council adopted. Held not to be a legal lay-out of the harbor lines, the lay-out being by the common council and not by a committee.

Where the common council had previously established harbor lines it was held that it was not precluded from altering them without further legis-lative authority. A legal establishment of new harbor lines would be a legal discontinuance of the old lines without any direct action for that purpose.

Where a harbor line was established solely in order that an expensive and sightly bridge might not be hidden from view by buildings placed on each side of it, it was held not to be a public use for which lands could be taken.

[Argued January 20th—decided March 20th, 1891.]

APPEAL from an assessment of benefits and damages in laying out harbor lines by the defendant city; brought to the Superior Court in Fairfield County. Facts found and case reserved for advice. The case is fully stated in the opinion.

*A. B. Beers* and *M. W. Seymour*, with whom were *A. M. Tallmadge* and *H. H. Knapp*, for the plaintiff.

*J. J. Phelan* and *G. W. Wheeler*, for the defendant.

SEYMOUR, J. The finding of facts states that the plaintiff is the owner in fee of certain real estate in the city of Bridgeport consisting of uplands, and, as a riparian owner, of the mud-flats adjacent thereto, on the east side of Bridgeport harbor.

It further appears that in the year 1886 the common council of the city legally designated and established a harbor line on the east side of Bridgeport harbor, which line ran over the mud-flats of the plaintiff and others, and assessed benefits and damages resulting therefrom to the respective parties interested.

At that time, and for many years before, a bridge existed over the harbor with which certain buildings were connected along the sides of the east end thereof. In pursuance of a vote of the common council, passed December 5th, 1887, the city proceeded to lay out a new bridge or public highway in substantially the same location as that of the bridge above mentioned, which new bridge was completed and opened as a public highway about December 8th, 1888. At the time the new bridge was completed the buildings along the sides of the east end thereof were connected with it, and still continue to be so connected.

On the 3d day of September, 1888, the board of public works made the following report to the common council:— " That in their judgment it would be wise, before the completion of the said new lower bridge, to take such action as would prevent the erection of buildings, either on the north or south sides of the iron portion of said structure, and connecting therewith on either side. Such action should be taken however in accomplishing this purpose as will result in the least injury to private rights. The board suggests the advisability of condemnation by the city, for public use, of so much of the adjoining property as will be necessary to secure the result desired, and recommend that the matter be referred to some appropriate committee for action." This

report was accepted, and referred to the street committee by the common council.

On the 10th day of December, 1888, the committee on streets reported to the common council on the report of the board of public works, and made the following recommendation :—" That such action be taken as will result in preventing the erection of buildings on either the north or south sides of the iron portion of the new lower bridge. The committee fully agree with said board that this expensive and sightly structure should not be marred by placing buildings on either side thereof ; and they further report that they have consulted the city attorney in reference to the subject, and, as a result of such conference, have come to the conclusion that the most desirable course to pursue, in order to accomplish the object desired, would be to establish harbor lines on both sides of said bridge."

The committee recommended the adoption of the following resolution :—" *Resolved*, that the committee on harbor improvements is hereby directed to take such preliminary action as will result in the establishment of harbor lines on both sides of the lower or Bridgeport bridge, extending from the present harbor lines at the western end of the eastern causeway of said bridge, westerly to the draw of said bridge." This report was accepted and the resolution adopted by the common council.

On the 7th day of January, 1889, the committee on harbor improvements reported on the report of the street committee relative to establishing harbor lines on both sides of the lower bridge, and recommended the adoption of the following resolution :—" *Resolved*, that the clerk is hereby directed to notify owners of property and parties in interest to appear before this common council, at the council room, on Monday evening, January 21st, 1889, at 8.30 o'clock, and be heard in relation to the establishment of harbor lines on the east side of Pequonnock river, as follows :—Beginning at a point in the harbor lines as already established, at the old wall or point of rocks, on property belonging to the Farist Steel Company, thence northeasterly in the direction

of the common center of Kossuth street and the new bridge, three hundred and forty feet, and thence northerly in a straight line to a point in the harbor line as already established at Howe's dock at the foot of Howe street; excepting that so much of said line as may lie upon or pass over the eastern approach to the new lower bridge shall remain inoperative and of no effect." The report was accepted, and the resolution adopted by the common council.

On the 21st day of January, 1889, the board of aldermen and the board of councilmen assembled in joint convention, and hearings were had relative to the establishment of said harbor line. On the 4th day of February, 1889, the committee on harbor improvements reported to the common council relative to the establishment of harbor lines on the east side of Pequonnock river, a hearing upon which was had before the common council January 21st, 1889. They recommended the adoption of the following resolutions :—

" *Resolved,* that harbor lines be and are hereby ordered, laid out and established, on the east side of Pequonnock river, north and south of the new lower bridge, commencing at the old wall or point of rocks on property of the Farist Steel Company, and extending northeasterly in the direction of the common center of Kossuth street three hundred and forty feet; and thence northerly, in a straight line, to a point in the established harbor lines at Howe's dock at the foot of Howe street.

" *Resolved,* that Messrs. John McNeil, Richard B. Cogswell and Charles R. Brothwell, be and are hereby appointed a committee, whose duty it shall be to make such lay-out of harbor lines, and report in writing their doings to the common council, which report shall embody a survey and particular description of said lines."

On the 18th of February, 1889, the committee reported, recommending the adoption of the following resolutions :—
" *Resolved,* that harbor lines, or dock lines, be and are hereby established on the east side of Pequonnock river, in accordance with a map thereof herewith submitted, and the following description of survey :—Beginning at a point in

the harbor line as already established, at the old wall or point of rocks on property belonging to the Farist Steel Company, thence extending northeasterly in the direction of the common center of Kossuth street and the new lower bridge three hundred and forty feet, and thence northerly in a straight line to a point in the harbor line, as already established, at Howe's dock at the foot of Howe street; excepting that so much of the line as may lie upon or pass over the eastern approach to said lower bridge shall remain inoperative and of no effect.

" *Resolved,* that the mayor appoint appraisers to estimate the damages and benefits resulting from the foregoing layout of harbor lines."

The resolutions were adopted, and the mayor thereupon appointed appraisers on said lay-out, who proceeded to assess benefits and damages thereon, and on July 1st, 1889, reported to the common council. In their report they did estimate, ascertain and determine that the appellant will receive an equal amount of damages and benefits from the establishment of the harbor lines. On the 15th of July, 1889, the common council accepted the report, whereupon this appeal was taken.

It seemed to be conceded on the argument that the report of the appraisers, that the appellant's damages and benefits are equal to each other, proceeded upon the theory that he is entitled to no damages on account of the establishment of the harbor lines. The finding states that a tract of land is taken by the lay-out of the proposed harbor lines, and the applicant is deprived of the use, benefit and worth of the same, and of all the privileges and franchises connected therewith, without compensation.

The first question therefore which we shall consider relates to the general right of the owner of lands abutting on navigable waters to damages for the legal establishment of a harbor line over the abutting flats, between high and low water marks.

In Connecticut the public is the owner in fee of the flats adjoining navigable waters up to high water mark, such

title being vested in the public for purposes of navigation and commerce. *Simons* v. *French*, 25 Conn., 346.

The owner of the adjoining uplands has the exclusive privilege of wharfing and erecting stores and piers over and upon such soil and of using it for any purpose which does not interfere with navigation, and it may be conveyed separately from the adjoining uplands. Over it he has the exclusive right of access to the water, the right to accretions, and generally to reclamations.

Because the soil, between high and low water marks, is held to be *publici juris*, the right of the owner of the adjoining upland in it is termed a franchise. But it is none the less a well recognized, substantial and valuable right. It constitutes, as the court says in *Simons* v. *French*, *supra*, speaking of the right of wharfage, like other franchises, a species of property which like other property is alienable by the owner, and alienable as well before the right has been exercised as it would be after a wharf had been actually erected.

It is claimed by the appellee that, inasmuch as the fee of the flats is in the state, therefore the state has the undoubted right, by itself or by those to whom it delegates the right, to take and use them for any public purpose without giving compensation therefor, so long, at least, as the upland proprietor has not appropriated them to such uses as he legally may.

There are cases which sustain such a claim. On the contrary there are cases which hold that riparian owners upon navigable waters have rights appurtenant to their estates of which they cannot be deprived, when once vested, except in accordance with established law and upon due compensation.

This, says Lewis, in his recent work on Eminent Domain, after reviewing the cases, seems the better and sounder rule. It certainly seems more in harmony with our Connecticut decisions that the right of wharfage, perhaps the most valuable franchise attached to the upland, is as much the sub-

ject of sale by the owner of the right before it has been exercised as it would be after.

The common council of Bridgeport in establishing harbor lines acts under the delegated power of the state. If the state might take the mud-flats of the appellant, in the legal establishment of harbor lines, without granting compensation therefor, on the ground that it owns them, and if the council representing the power of the state might, if it were so authorized, possess the same power, yet no such power is given or intended. The state has a right to give compensation and to require the city to do so; and this it has expressly done.

Section 38 of the city charter provides that the common council shall have power to designate and establish a line or lines, on or along either or both sides of Bridgeport harbor or Pequonnock river, or on any part thereof, from the mouth of the harbor to Berkshire mill, and in designating and establishing such line or lines for the purposes aforesaid similar proceedings in all respects in relation thereto, and in relation to benefits and damages therefor, shall be had, and the persons whose lands or mud-flats are thus taken and appropriated, or who are especially benefited or damaged thereby, shall have the same rights, and be subject to the same obligations and liabilities, as in the case of the lay-out, alteration or enlargement of highways, streets, public walks, etc., in said city.

Section 32 of the charter provides that before the common council shall determine to lay out, alter, extend, enlarge, discontinue or exchange any highway, street, public walk, etc., in said city, they shall cause reasonable notice to be given describing in general terms such proposed lay-out or alteration, and specifying a time and place when and where all persons whose land is proposed to be taken therefor may appear and be heard in relation thereto by the common council assembled in joint convention for such hearing; at which time and place, and at any meeting adjourned therefrom, the common council shall hear all the parties in interest who may appear and desire to be heard in relation thereto.

Section 33 provides that if, after such hearing, the common council shall resolve to lay out, alter, extend, enlarge, discontinue or exchange such street, highway, walk, avenue, park or landing place, they shall appoint a committee whose duty it shall be to make such lay-out or alteration and report in writing their doings to the common council; which report shall embody a survey and particular description of such street, highway, etc., or alteration thereof.

Section 34 provides, if said report shall be accepted, for the appointment of three judicious and disinterested freeholders of the city to estimate and appraise the benefits or damages, as the case may be, accruing or resulting to any person or persons from the taking of such land for public use or from such lay-out, alteration, etc. Said freeholders shall be sworn, and before making any such assessment of damages and benefits shall give reasonable notice to all persons interested of the time and place when and where they shall meet for that purpose. They shall meet at the designated time and place, and at such other times and places as they shall adjourn to therefrom, and shall hear all parties in interest who may appear; and they shall thereupon ascertain and determine what person or persons will be damaged by such taking of land or such lay-out or alteration, and the amount thereof over and above any damages they may receive therefrom; also who will receive an equal amount of damages and benefits therefrom. Thereupon they shall report to the common council. The report shall be continued to its next general meeting and published. Upon the acceptance of the report at the next meeting of the common council the same shall be recorded, and the common council shall cause a notice containing the names of the persons assessed, with the amounts of their respective assessments, to be published as in the section directed, and such publication shall be deemed to be legal and sufficient notice to all persons interested in the assessments.

Section 35 provides that upon the acceptance of the report of the freeholders, the survey and particular description which the charter requires to be made, (sec. 33,) shall

be signed by the mayor, or in his absence by the president of the board of aldermen, and recorded in the records of the board of aldermen.

Section 42 provides that any party who shall feel aggrieved by any act of the assessors in making any of the assessments of benefits or damages authorized in the charter, may make application for relief to the Superior Court or Court of Common Pleas in and for Fairfield County, which court may confirm, annul or modify the assessments, or make such order in the premises as equity may require.

These extracts from the charter show that whatever right the state might have to take the property of the appellant in the flats between high and low water mark, yet it has authorized the council to take it only upon the payment of just compensation therefor; and upon this appeal the appellant has, of course, a right to be heard upon the question of damages, if the other proceedings should be held to be regular, so that a legal assessment can be made.

But the appellant not only claims that the assessment gives it no compensation for the taking of its property, and is therefore unjust and illegal, but it also claims that the assessment was invalid, because, to state it generally, there has been no legal discontinuance of the harbor line established in 1886, and because the action of the common council in the matter of establishing the harbor lines in question has been irregular and illegal, so that no lawful layout of said lines has been made, and no legal assessment of damages and benefits has been or could be made thereon. The reasons are set forth particularly in the appeal and are based upon the facts stated in the finding and reservation.

We see no good reason for holding that the council, having in 1886 established harbor lines on the east side of the harbor, is thereby precluded from altering them by the subsequent establishment of new lines as proper occasion may require, without further legislative authority. We think, also, that the legal establishment of new harbor lines would, of itself, be, to all intents and purposes, a legal discontinu-

ance of the old lines, without any specific action declaring
them to be discontinued.

We come now to the question whether the harbor lines
were legally established according to the provisions of the
charter.

That instrument, as we have seen above, provides that, in
designating and establishing harbor lines, similar proceed-
ings in all respects in relation thereto, and in relation to
benefits and damages therefor, shall be had as in the case of
the lay-out, alteration or enlargement of highways, streets,
public walks, etc., in said city.   That is, as will appear by
reference to the proper section and adapting it to these pro-
ceedings, if, after certain preliminary steps, the common
council shall decide to designate and establish a harbor
line, they shall appoint a committee whose duty it shall be
to make such lay-out and designation, and report in writing
their doings to the common council, which report shall em-
body a survey and particular description of such harbor line.

By reference to the finding incorporated in the early part
of this opinion it appears precisely what was done in rela-
tion to the lay-out, after the steps preliminary to the ap-
pointment of the committee to make such lay-out had been
taken.   To briefly summarize it :—February 4th, 1889, the
committee on harbor improvements reported resolutions
which the council adopted and by which a committee was ap-
pointed to lay out the harbor lines and report their doings
to the council.   February 18th, 1889, the last named com-
mittee reported and recommended resolutions for adoption,
which the council adopted.

Now the appellant claims that it appears from an exami-
nation of the above proceedings in detail that there has
been no legal lay-out and establishment of said harbor
lines ; that it appears, and that such is the fact, that no ac-
tion whatever was taken by the committee respecting the
lay-out and establishment of harbor lines, except to report
back and recommend the acceptance of the resolution, in
substance, passed by the common council February 4th,
1889 ; that the committee neither laid out nor established,

nor does their resolution purport to lay out and establish, any harbor line, but only to recommend that the same be established by the common council, and that the common council, in adopting the resolution, itself laid out and established such line.

This precise point, among others, was discussed in *Gregory* v. *City of Bridgeport*, 52 Conn., 40.* In that case a petition for widening a highway was referred by the common council to a committee. The committee subsequently reported as follows :—" The committee on streets and sidewalks beg leave to report concerning the widening of the approach to the lower bridge, and recommend the adoption of the following resolutions :—

" *Resolved*, that the widening of the western approach to the lower bridge from the present north line of the street approaching the bridge, extending along the harbor seventy feet south on a line with the present wharf, and extending from the wharf westerly to the railroad, according to the map and survey thereof made by the city surveyor and submitted herewith, be accepted and approved, and the same be and become, after the final settlement of assessments, a part of the highway thereto.

" *Resolved*, that the mayor appoint a special committee of three judicious and disinterested freeholders to estimate and appraise the benefits or damages, as the case may be, accruing or resulting to any person or persons from said widening."

Upon this state of facts the court said :—" There is nothing here which purports, even, that the committee had laid

*Note. The head note of the case here referred to, by an error of the reporter, does not accurately present the point decided by the court. It should be corrected as follows:—

In the 8th line of the head note strike out the words " *a proper committee to refer such a matter to*," and insert " *without a reference to it for that purpose, a committee to make the lay-out.*" The last sentence of this paragraph would then read as follows:—" Held that a standing committee on streets and side-walks was not, without a reference to it for that purpose, a committee to make the lay-out under this provision of the charter."

In the 5th and 6th lines of the second paragraph of the head note, strike out " *even if the committee had been the proper one.*" REPORTER.

out the widened part of the street; * * * obviously the report is nothing more than a recommendation to the council that the widening should be made in accordance with the map and survey submitted." Again the court says:—"If what was done October 3d (the day the report was accepted), can be construed as a lay-out of the alteration of the street, the lay-out was made by the common council alone, contrary to the express provisions of the charter. The committee simply recommend the alteration described to the common council for their acceptance and approval. The council accepted and approved, and if, by so doing, the alteration was laid out, who did it? The committee by their report and recommendation do not pretend to have done it. They described the alteration, it is true, but this was necessary to enable the common council to know what alteration should be laid out. * * * It is clear, if there was any lay-out here, that it was done by the common council and not by the special committee, as the present charter requires. But there was no lay-out of this improvement, and consequently no basis for the assessment of damages or benefits, and the assessment was therefore void."

Manifestly, if that case is still an authority, there has been no legal lay-out and establishment of the harbor line in dispute.

It is claimed, however, that it is overruled on that point by *Hough* v. *City of Bridgeport*, 57 Conn., 290. It is true that it would seem from the case as stated in the opinion that the same question might have been made. If it was, there is no intimation that it was considered and decided, and no suggestion that anything therein contained overruled the point so explicitly stated in the former case. Instead of overruling, it distinguished the case of *Gregory* v. *City of Bridgeport* from the one then under consideration. The first held that, under the charter, which provides that if, after certain preliminary proceedings, the council shall resolve to lay out a street, it shall appoint a committee to make such lay-out, the standing committee on streets and sidewalks was not of itself, and without such special reference, such a com-

mittee as was intended by the charter. In point of fact, as the opinion shows, upon receipt of the petition for widening the highway, the council immediately referred it to the standing committee on streets and side-walks. That committee subsequently reported resolutions that the common council should order the widening to be made according to plans which it submitted. The resolutions were adopted, and furnished the first indication that the council resolved to make the lay-out. The charter was not followed, no committee was appointed to make the lay-out after the council had resolved that it should be made. The only committee which acted was the standing one on streets and side-walks, to which the matter was referred before the lay-out was resolved upon by the council.

Now in *Hough* v. *City of Bridgeport*, the standing committee on streets and side-walks was also appointed a committee to make the lay-out. Relying upon the general statement of the syllabus in *Gregory* v. *City of Bridgeport*, it is evident that the claim was made that such a reference was contrary to the charter. Thereupon the court distinguishes the two cases, and shows that, whereas in the former case the petition was referred to the standing committee immediately upon its receipt, not to make a lay-out but to examine and report what should be done, and no committee was appointed to make the lay-out after the council had resolved upon it, yet in the latter case the regular steps in this behalf were taken, and, though the lay-out was committed to the standing committee on streets and side-walks, it was as a special committee, appointed after the council had resolved to make the lay-out, and consequently the decision in *Gregory* v. *City of Bridgeport* was not applicable.

The second point made was that the committee appointed after the council had resolved upon the lay-out was not appointed to lay out the street, but to procure and report to the council a survey, etc. This the court says is a distinction without a difference, and that, taken in connection with its fellow resolution ordering the extension, it is to be construed as a direction to the committee to lay out the street

as well as to procure and report a survey of it. No other point which was in any respect common to the two cases was discussed or decided.

If the point made in *Gregory* v. *City of Bridgeport* and in the case at bar, that the council and not the committee made the lay-out, was made, the law respecting it, as laid down in the former case, was not in terms overruled. We are not disposed to overrule it nor evade it. · Under the charter it is necessary, and upon general principles it is expedient, that a committee should make the lay-out. In theory, at least, it is not a mere formal thing which anybody can do, off hand, upon paper, but should be done carefully, and, as far as possible, with a view to the convenience of individuals, even after general directions have been given by the council.

One other point demands consideration. It is claimed that, even if all the proceedings were legal in form, yet there is a fatal objection to the validity of the assessment, in that the case itself discloses the fact that the harbor lines were established and the appellant's land condemned in order that the new bridge, that " expensive and sightly structure, should not be marred by placing buildings on either side thereof ; " and not for any legitimate public use whatever.

The appellant says that, except for public uses, private property cannot be taken even upon the payment of just compensation. We presume that no one will question the correctness of that proposition. The taking of private property in the legal establishment of harbor lines is *primâ facie* a taking for public use. The legislature so considered it in granting the charter to the city of Bridgeport, and, though that fact is not conclusive, inasmuch as it is held almost universally that whether a particular use is public or not within the meaning of the constitution is a question for the judiciary, still there can be no question but that property taken in the legal establishment of harbor lines is taken for public use. But the right to establish harbor lines, and to take private property for that purpose, must be exercised in good faith and for a public use naturally connected with their

establishment. Private property cannot be taken for other than public uses under the guise of taking it for public use. There may be difficulty in many cases in applying this rule, as where nothing appears in the proceedings of the purpose for which the lines were established, and the presumption would be that they were established in the interest of navigation. But where, as in the present case, all the proceedings declare the purpose to be an ulterior one, which no one would claim to be a public one within the meaning of the constitution, when this purpose is spread upon the very records which are laid before us as containing the authority on which the assessment committee acted, we should be shutting our eyes to the real state of affairs, and permitting property to be taken under the excuse of the right of eminent domain in a case where no public use was contemplated, if we should decide in accordance with the appellee's claim. That would commit us to the doctrine that we are bound by the fact that it was a harbor line that was established, no matter for what purpose it appears to have been established nor how far it is removed from the harbor. We cannot accept that conclusion, but must hold that, whereas it appears from the records themselves, which are introduced to show the facts upon which the legality of the assessment depends, that the harbor lines were laid out for the purpose of preventing a new bridge from being marred by the building of structures connected with it which would obscure it, and not in the interests of navigation or any other public use, private property cannot be taken without violating constitutional rights.

It is unnecessary to consider the other questions which were discussed. Upon those already considered we advise the Superior Court to render judgment for the appellant, annulling the assessment appealed from.

In this opinion the other judges concurred.