DANIEL E. MORAN ET AL. *vs.* CHARLES W. DENISON ET AL.

Second Judicial District, Norwich, October Term, 1906.
BALDWIN, HAMERSLEY, HALL, PRENTICE and SHUMWAY, Js.

In an action in the nature of ejectment the plaintiff must recover, if at all, by the strength of his own title and not by the weakness of the defendant's.

The line or direction in which littoral rights of reclamation and wharfage may be lawfully exercised does not shift from time to time with every passing alteration in the contour of the shore. If new conditions are relied upon to beget different rights, they must at least be shown to be definite and substantial in their character, to possess the appearance of stability and permanence, to produce an essentially different situation, and to necessitate a readjustment of rights in order that a fair and reasonable access to the sea may be afforded to all abutting proprietors.

It is impossible for a court to readjust such littoral rights, unless— among other factors invariably present in such a problem—the location of the shore line at the time of the alleged disseisin is determined with reasonable precision; and accordingly a plaintiff, whose asserted rights of reclamation depend upon a substantial change in the formerly-established line of the shore, must prove such changed location, or fail in his action for want thereof, if for no other reason.

Argued October 16th—decided December 18th, 1906.

ACTION to recover the possession of certain riparian premises together with damages, and for an injunction, brought to and tried by the Superior Court in New London County, *Gager, J.;* facts found and judgment rendered for the defendants, and appeal by the plaintiffs. *No error.*

Shaw's Cove is an arm of the sea forming a part of New London harbor and extending in a general northerly direction from the main body of the harbor into the mainland lying on the westerly side thereof. The defendants and their predecessors in title have from time immemorial been the owners of a tract of upland fronting upon the easterly shore of said cove, to wit: that portion of A. I. J. B., as shown

upon the map printed herewith, which was above the high-water line.   This line in the immediate vicinity of the *locus* in 1807, when the record begins its detailed history, extended along the curved line R. Q. upon the map, thus  forming a

concave shore.   Upon the opposite side of the cove the high-water line was as represented in U. V. upon the map. A few years prior to this time a causeway of solid earth with retaining walls had been constructed for highway pur-

poses across the waters of the cove, leaving tidal water between it and the shore line in front of the land described and the neighboring land. This causeway is shown upon the map as Bank Street, by which name it is now known, and extends in a general direction east and west. The water flowed and reflowed through an arch in the causeway and on some 500 feet to the north of Blinman Street.

In 1838 one Rogers, a predecessor in title of the defendants, became the owner of this tract of upland. Already his predecessors in title had begun to reclaim from the sea the territory in front of the upland and northerly of the causeway. This reclamation had been carried seaward between two lines in extension in straight lines of the boundary lines of the original tract of upland, which were parallel and four rods apart. Beyond the causeway a building resting upon mud sills had been built along and up to the westerly line thus extended. About 1871, Rogers filled in south of the causeway and within the lines described, for a considerable distance seaward, and set a mere-stone on said westerly line about 40 feet southerly of the causeway. He also, some years prior to 1890, set a line of spiles along said westerly line continued from the end of the fill to a distance not definitely established. This westerly line of reclamation and use has always been acquiesced in as the true one by the owners of the adjoining property, and has been the one to which the use of the defendants and their predecessors in title has extended. About 1890 further filling was begun and thereafter continued from time to time, and about 1891 a double line of spiles, shown upon the map, was driven along this same westerly line preparatory to the construction of a wharf. These spiles extended as far south as the point of the triangle of land in controversy, and a little beyond. The defendants acquired the property in December, 1903, and have since that time completed the reclamation of all that portion of the cove lying within said two extended straight lines and northerly of the harbor line.

If a straight line had been drawn from headland to head-

land across the waters of the concave shore as it was in 1807, it would have substantially coincided with the map line R. Q., and a perpendicular thereto, drawn from the southwest corner of the defendants' upland as it then was, would have departed only a little from the westerly line of reclamation, that departure being to the west rather than to the east.

In 1861 one Wilkinson purchased a water lot lying south of and abutting upon said causeway about 80 feet and extending into the cove. The grantor in this conveyance owned the piece of upland fronting upon the shore which lay next west of the line G. H. Between that upland and the upland which has now passed to the defendants, the tract A. B. H. G. intervened. The lot conveyed, as the court has found from the deeds, lay within the lines W. M. Y. and did not embrace the triangular strip M. N. Y. After his purchase, Wilkinson filled in that side of his lot next to the causeway to a depth of from 50 to 70 feet, and in 1882 built an opera house upon it substantially rectangular in shape, 70 feet front and 150 feet deep. This building rested upon the reclaimed land in front and upon spiles in the rear. It stood at right angles with the causeway, and its northeasterly corner (M.) was coincident with the northeast corner of the lot. As the structure extended back from the causeway it was built over the boundary line and covered the triangle M. Y. N. The plaintiffs are the successors in title to Wilkinson, and the physical condition of the property has since the erection of the opera house remained unchanged by filling in or wharfing out. Title to the triangle M. Y. N. has been acquired by Wilkinson and his successors by adverse possession. The space between the opera house and the defendants' property belongs to strangers to this suit. That part next to Bank Street has been reclaimed. The outer portion has not.

All the upland owners along the piece of shore in question have from time to time exercised their rights of reclamation and wharfage. As the result, all the territory northerly of the old causeway, now Bank Street, has been

reclaimed.　South of Bank Street all the upland owners had, before the defendants' extension which has occasioned the present controversy, filled in to a greater or less extent. The precise situation thus resulting is not found by the court save in some respects, and it is impossible to gather it from the record except by reference to certain maps annexed to the finding and by assuming for them a correctness which is not found.　One of these maps is that herewith printed.　It deals with the conditions subsequent to the defendants' reclamation which has occasioned this controversy, along some 650 feet of water frontage and extending in either direction from the *locus*.　Presumably, although not certainly, it, with the exception referred to, correctly represents the situation as it was before the defendants' recent work was begun.　The distance from Bank Street to the harbor line S. T., established by the Federal government about 1892, is about 350 feet.　The shaded spots represent buildings.　Another map shows that to the east of the limits of the map last described the sea, in 1892 at least, flowed up to not far from Bank Street for a considerable distance of shore frontage, beyond which the shore line turned toward the harbor.

The present controversy concerns the triangular piece of land, measuring about 20 feet upon the harbor front, which forms the extreme southwesterly corner of the defendants' recent reclamation and lies west of M. N. extended in a straight line.　It is represented as D. E. F. upon the map.

*Abel P. Tanner* and *John J. Lawless*, for the appellants (plaintiffs).

*Hadlai A. Hull*, with whom was *Clayton B. Smith*, for the appellees (defendants).

PRENTICE, J.　The plaintiffs are seeking to recover the possession of a small triangular strip of land recently reclaimed by the defendants from the sea.　They contend that the defendants in reclaiming this strip of land have

invaded that portion of land covered by the sea which the plaintiffs, as upland owners bordering upon the sea, were, in the exercise of their littoral rights, entitled to reclaim. They rest their rights upon no other foundation than this. The upland, by virtue of the ownership of which it is claimed that the plaintiffs are entitled to the asserted littoral rights, is that piece of reclaimed land upon or over which their opera house building rests and which is separated by the sea from the land in controversy.

The plaintiffs must recover, if at all, upon the strength of their own title shown. *Cahill* v. *Cahill*, 75 Conn. 522, 54 Atl. 201, 732. The burden thus cast upon them is in this case emphasized by the fact that the westerly line, which has marked the limit of the reclamations by the defendants and their predecessors in title, is one to which, for its full length, the conditions in respect to the shore, the upland ownership, and the location of deep water, as they originally were, would have justified a reclamation by the owners of the defendants' upland. Had the filling which the defendants have made been made years ago by the then owners of their upland, no objection could have been made by any one to whose rights the plaintiffs have succeeded. This we understand the plaintiffs to concede. *Lowndes* v. *Wicks*, 69 Conn. 15, 30, 36 Atl. 1072. The plaintiffs' contention, therefore, has no other foundation than in changed conditions whose consequence has been to give the plaintiffs rights not enjoyed by their predecessors in title, and to deprive the defendants of rights which their predecessors in title once had, at least as against the plaintiffs and their predecessors. This contention rests upon the legal premise that littoral rights are to be determined by conditions as they exist at the time, and not as they may have been at some time in the past. It is unnecessary to stop to analyze this proposition to discover what of truth it expresses or to mark the bounds of the truth which doubtless lies within it. Certain it is, that the rights of reclamation and wharfing out which are incident to ownership of land upon the sea do not shift with every passing change

in conditions, and that those new conditions which accomplish changes in these rights must at least be definite and substantial in their character, possess the appearance of stability and permanence, produce an essentially new situation and require a new adjustment of rights in order that a fair and reasonable access to the sea may be afforded to all. *Lowndes* v. *Wicks*, 69 Conn. 15, 30, 36 Atl. 1072. Accepting, therefore, the plaintiffs' proposition with this qualification, let us examine the facts disclosed by this record.

Into the determination of problems such as are here presented certain factors invariably enter, to wit, the location of the shore line, the location and limits of location of upland ownership as it touches the shore line, and the location of the channel or deep water. Other factors oftentimes have to be taken into account. These, however, are constant. The location of the shore line assumes a double importance, in that it enables its configuration and general trend to be ascertained, and the limits of upland ownership as they touch it to be determined. Upon the trial of this case a former shore line, which would not serve the plaintiffs' present purpose, was shown. It was shown that subsequent to that time and prior to the defendants' extension of their property which has resulted in this action, the process of reclamation had been going on at the pleasure of the upland owners, and that as the result of that process Bank Street had been passed at every point, and the outer line of reclamation along the whole frontage in the vicinity of the *locus* had been carried beyond that highway to greater or less distance seaward. The plaintiffs claimed that in this situation the highway marked the shore line. This contention is not in accord with the facts just recited. Looking further for the shore line at the time when the defendants reclaimed the land in question, it cannot be discovered from either the finding or the maps, unless it be said that the tortuous and transient resultant of individual caprice which for the moment marked the outer line of fill is to be regarded as it. If this be assumed, it is clear that

the location of it and the situation surrounding it, whether attention be confined to the limited frontage detailed upon the map herewith printed, or extended to comprehend what little is otherwise revealed beyond its limits, is neither such nor so certainly known as to justify a court in accepting it as satisfying the conditions demanding such a readjustment of the littoral rights of the upland owners as would make the defendants' reclamation of the land in controversy an encroachment upon the plaintiffs' field of development. This is equally true, whether an appeal is made, as here, for the application of one of the general rules which have been accepted as applicable to ordinary conditions, or whether the situation be regarded as one demanding a study of the special features and needs of the situation, and of the conflicting interests of the upland owners, to the end that an adjustment may be made so that to each and all a fair and reasonable access to the sea under all the circumstances may be made. To hold otherwise might, under the existing conditions, lead to some very unequal and unjust consequences.

The plaintiffs suggest, in aid of their contention, that the narrow basin between the Higgins and Ladd wharves, which have for some years extended to the harbor line on either side of the *locus,* ought to be considered as a concave shore with the two wharves as the promontories marking its limits, and the general rule for concave shores applied thereto, giving a line from promontory to promontory across the basin, perpendiculars to which should indicate the direction in which reclamations might be made. This suggestion is one which takes an altogether too narrow view of the shore situation, and attaches too much importance to the temporary accidents of artificial construction.

The trial court decided against the plaintiffs upon the ground that they had no title other than by prescription to the triangle M. N. Y., and that the next easterly owner and his predecessors in title, against whom the prescriptive title to the triangle had been acquired, have ever retained

and now retain a substantial upland frontage and an opportunity to make available all the wharfage rights originally belonging to it. Upon these facts found, the court held that the plaintiffs had not gained by adverse possession any rights beyond the limits of the ground actually occupied. As upon the plaintiffs' own claim their failure to establish the rights thus denied them was fatal to their right of recovery, judgment was rendered against them. Our views as to the broader aspects of the case render it unnecessary for us to examine the soundness of the conclusions, whether of fact or law, upon which the court relied in its rendition of judgment upon the narrower ground stated. It is also unnecessary to consider other objections to the plaintiffs' right of recovery which the defendants have urged.

There is no error.

In this opinion the other judges concurred.