JUNIUS C. ROCHESTER *vs.* NORA STANTON BARNEY.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued June 9th—decided November 7th, 1933.

*Warren F. Cressy,* for the appellant (defendant).

*Raymond E. Hackett* and *Mark C. Candee,* for the appellee (plaintiff).

AVERY, J. The two parties to this action are owners of adjoining estates bordering upon the waters of Long Island Sound in the vicinity of Mead's Point in Greenwich, Connecticut. Originally, both properties were owned by The Maremont Corporation. The defendant derives title through a conveyance by that corporation to her predecessor December 22d, 1924. In the description of the deed, the boundary line ran along the high-water line of Long Island Sound "Easterly, Southerly, Northeasterly and Northerly," the defendant's land being Lot No. 1 on the map of the property, and shown on the following page, by reference to which it will appear that it is on a point projecting into Long Island Sound in a southerly direction at an acute angle, so that it has water front upon its southeast and southwest sides. The plaintiff's lots, Nos. 2 and 3 on the map of The Maremont Corporation and lying immediately west of the de-

464

LEGEND

SOLID LINE SHOWS
MEAN HIGH WATER MARK
——— SHOWS DIVISIONAL
LINE AS FIXED BY THE
COURT.
×××× RECLAMATION
IN ACCORDANCE WITH
PLAINTIFFS CONTENTION

SAW ISLAND

CAUSEWAY

BARNEY

ROCHESTER

MON-

WÄTJEN

96°

CAUSEWAY

HORSE ISLAND

LINE BETWEEN HEADLANDS

WATERS OF LONG ISLAND SOUND

fendant's land, were conveyed to the plaintiff's predecessor in title at a somewhat later date. The deeds describing the line, bound the lots as running "westerly along the high-water mark of Long Island Sound as the same winds and turns." As will appear from the sketch, they form, with the defendant's land, a small bay and face the Sound to the southwest.

Some years later, both the plaintiff and the defendant received conveyances from the corporation of all littoral and riparian rights, privileges and franchises appurtenant to the upland belonging to the respective parties. Southerly, and in front of plaintiff's property between it and the main body of water of Long Island Sound is Horse Island (owned by a third party) some six hundred and fifty feet long and two hundred feet wide, which is about four hundred feet distant from the mainland, with which it is connected by a causeway leading to a roadway next adjoining plaintiff's land on the southwest. Southeasterly, and in front of defendant's property is Saw Island (owned by a third party) some six hundred feet long and one hundred feet wide, which is about four hundred feet distant from the mainland at its southerly end and two hundred and fifty feet at its northerly end, and is also connected with the mainland by a causeway which is the continuation of a private road constituting the northerly boundary of both estates. Horse Island is about two hundred and fifty feet distant from and southwesterly of Saw Island and the space between is the natural entranceway to the waters in front of both pieces of property. The low-water mark in front of plaintiff's land is located between these islands, and is beyond and easterly of the nearest connecting point of the plaintiff's property and Horse Island, and at low tide the space interven-

ing between the defendant's property and Horse Island consists of entirely exposed mud flats.

Practically the entire area covered by the waters in front of these estates and within Horse and Saw Islands and the causeways from the mainland to them is above the line of mean low water so that the bottom is uncovered at average low tide, the mean low-water mark coming slightly within the entranceway between the islands in front of and approximately three hundred and fifty feet distant from defendant's property. There are no navigable channels between high and low-water mark in front of plaintiff's land. The general trend of the shore line of the mainland, of which the littoral boundary lines of the parties form a part, taking a considerable distance into account and omitting to notice small indentations and projections, is a broad concave curve facing Long Island Sound. This curve is flanked by and lies between two headlands approximately twenty-eight hundred feet apart, one being located west of the mouth of Cos Cob Harbor, north of Goose Island, and the other southwest of Horse Island. The north shore of Long Island Sound, taking a very great distance into account, such as from New Rochelle to a point considerably easterly of Mead's Point and Greenwich Point, and omitting to notice small indentations and projections, is a straight line running approximately from the southwest to the northeast and is substantially parallel to a base line connecting the headlands described.

The present action was brought by the plaintiff to restrain the defendant from interfering with plaintiff's riparian rights by building a sod dyke and filling in below mean high-water mark upon the southwest shore front of her property, and for determination of the rights and privileges of the parties to the land under

water appurtenant to the upland belonging to them respectively.

The trial court has found that for the purpose of locating and establishing a base line to be used in determining the division line between the respective properties below mean high-water mark, that the selection of the two headlands mentioned was reasonable and proper, and that no evidence was offered to the contrary or that any other base line should be selected for that purpose. Thereupon, the trial court proceeded to determine the respective rights of the parties to the land appurtenant to their properties below mean high-water mark by running perpendiculars from the base line so established to the intersection of the respective boundaries with the line of mean high water, with a slight exception. Had the divisional line been projected in a straight line from the monument perpendicular to the base line, it would have intersected a strip of rock about twenty-five feet in length and varying in width from six feet to zero. This strip of rock is barren of any soil or growth and slopes gradually to the waters at that point. The trial court, however, in an effort to avoid running the divisional line across this rock dropped the perpendicular from the intersection of the upland dividing line of the parties with the mean high-water mark to the point where the perpendicular intersected the narrow strip of rock. From that point on, the trial court followed the mean high-water mark around the narrow strip of rock until it reached a point where the perpendicular, if projected across the rock, would again cross the mean high-water mark. From that point on the trial court followed the perpendicular in its southeasterly course. The line of division established by the court gave to each of the parties means of access be-

tween the two islands lying off the shore and the waters outside.

Upon this appeal, the defendant makes two general claims: First, that the method of determination of the rights of the respective parties in the submerged land appurtenant to their respective uplands was not appropriate, the broad claim of the defendant being that the physical situation was that of lands bordering upon a cove, such as existed in *Ockerhausen* v. *Tyson,* 71 Conn. 31, 40 Atl. 1041; *Richards* v. *New York, N. H. & H. R. Co.,* 77 Conn. 501, 505, 60 Atl. 295. The second contention of the defendant is that even if the method of determining the dividing line is correct, the judgment is too broad.

The trial court has expressly found that the waters bounding the upland belonging to the respective parties do not form and are no part of a cove but are parts of the main waters of Long Island Sound, and that the general configuration of the coast line is a broad concave curve. In Connecticut, the public, whose representative is the State, is the owner of the soil between high and low-water mark upon navigable water where the tide ebbs and flows. The owner of the adjoining upland has certain exclusive yet qualified rights and privileges in the waters and submerged land adjoining his upland. He has the exclusive privilege of wharfing out and erecting piers over and upon such soil and of using it for any purpose which does not interfere with navigation, and he may convey these privileges separately from the adjoining land. He also has the right of accretion, and generally of reclamation, and the right of access by water to and from his upland. *Farist Steel Co.* v. *Bridgeport,* 60 Conn. 278, 283, 22 Atl. 561; *Prior* v. *Swartz,* 62 Conn. 132, 25 Atl. 398; *Brower* v. *Wakeman,* 88 Conn. 8, 89 Atl. 913; *Barri* v. *Schwarz Bros. Co.,* 93 Conn. 501, 107 Atl.

3; *Walz* v. *Bennett,* 95 Conn. 537, 542, 111 Atl. 834. However, where a party's upland bordering on navigable waters adjoins and abuts the property of another, each must exercise his respective littoral rights with due regard for the corresponding rights of the other. *Ockerhausen* v. *Tyson,* 71 Conn. 31, 39, 40 Atl. 1041. The right of access is distinct from that which each has as a member of the public. *Richards* v. *New York, N. H. & H. R. Co.,* 77 Conn. 501, 505, 60 Atl. 295. The fundamental riparian right on which all others depend is the right of access. *Orange* v. *Resnick,* 94 Conn. 573, 582, 109 Atl. 864. This is the most important consideration in any division of the respective rights of the parties to land under water.

In apportioning these riparian rights, the object to be kept in view is to so extend the lateral lines of adjoining owners of upland as to secure to each rights appropriate to, and over an area proportioned in extent to, his shore lines. *Blodgett & Davis Lumber Co.* v. *Peters,* 87 Mich. 498, 49 N. W. 917; *Tappan* v. *Boston Water Power Co.,* 157 Mass. 24, 31 N. E. 703; *Mulry* v. *Norton,* 100 N. Y. 424, 3 N. E. 581; 4 R. C. L. 91; 45 C. J. 513. Also, the aim of all rules, "as applied to the rights of adjoining riparian proprietors on an irregular shore, [is] to give each, as far as may be, a fair and reasonable opportunity of access to the channel." *Lowndes* v. *Wicks,* 69 Conn. 15, 29, 36 Atl. 1072. For the purpose of reaching an equitable division in many cases a satisfactory result has been obtained by running a perpendicular from the intersection of the upland boundary line with the high-water mark to a theoretical base line. Where the general course of the shore is a straight line, the division of riparian rights between adjoining landowners is along a perpendicular to the straight line from the intersection of the upland boundary line between the parties

with the high-water mark. *Rowe* v. *Smith,* 48 Conn. 444, 448; *New Haven Steamboat Co.* v. *Sargent & Co.,* 50 Conn. 199, 208; *Armstrong* v. *Wheeler,* 52 Conn. 428, 432. Where the general course of the shore is a curved convex line, the division is along the line of the radius of the curve extended from the intersection of the upland boundary line between the parties with the high-water mark. *Morris* v. *Beardsley,* 54 Conn. 338, 341, 8 Atl. 139; *Lane* v. *Smith Brothers,* 80 Conn. 185, 188, 67 Atl. 558. Where the general course of the shore is a broad concave curve, the division is along a perpendicular from the intersection of the upland boundary line between the parties with the high-water mark to a base line drawn across the mouth of the curve. *Lowndes* v. *Wick,* 69 Conn. 15, 30, 36 Atl. 1072; *Moran* v. *Denison,* 79 Conn. 325, 65 Atl. 291. However, no rule can be laid down which is applicable to every situation, since much must depend in every instance upon the shape of the upland, the arm of the sea and their relative position to each other. *Simons* v. *French,* 25 Conn. 346, 354.

As the general contour of the shore line in the instant case is found to be a broad concave curve, the rule substantially applied by the trial court—adoption of a line perpendicular to a base line, drawn across the mouth of the curve, to the upland boundary at high-water mark—would be appropriate if there were no other circumstances affecting its applicability. It is quite apparent, from the finding and the sketch, however, that this line fails of accomplishment of the requirements of an equitable and proper division in two important respects. It accords to the defendant riparian rights over an area proportionate only to her southeasterly shore front to the exclusion of that portion of her shore line which faces southwesterly, and it deprives her of access by water to and from the latter.

For these reasons it is inadmissible. On the other hand, a line such as is suggested by the defendant, running from or through the easterly extremity of Horse Island to a southwesterly extension of the upland boundary line between plaintiff and defendant, would cut the plaintiff off from access, in his own right, from his shore to deep water. It would seem to be practicable, however, by a further modification, justified by the exceptional circumstances presented, of the rule applied by the trial court, to prescribe a boundary line which will fairly preserve the essential rights of both parties. By way of illustration merely, it appears that a straight line running from at or about the point designated by the trial court on the base line adopted by it, to meet an extension of the upland boundary line between the parties southwesterly in a straight line at a point a sufficient distance westerly from high-water mark to leave a reasonable space between the first mentioned line and the defendant's southwesterly shore line, would give the defendant rights over an area fairly proportionate to her shore frontage and access from all of it. At the same time it would afford the plaintiff his fair share in area and adequate access past the easterly end of Horse Island to the navigable waters of the Sound. It is, of course, the province of the trial court to determine the line which will best answer the requirements of the situation, in view of all the facts.

There is error and a new trial is ordered.

In this opinion the other judges concurred.