### NORMAN BLOOM ET AL. *v.* WATER RESOURCES COMMISSION ET AL.

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued January 10—decided February 4, 1969

*Sidney Vogel,* for the appellants (plaintiffs).

*Brian E. O'Neill,* assistant attorney general, with whom, on the brief, was *Robert K. Killian,* attorney general, for the appellee (named defendant).

*John E. Vallerie, Jr.,* for the appellee (defendant Vallerie).

KING, C. J.   On October 9, 1967, the defendant Albert E. Vallerie filed with the named defendant, the state Water Resources Commission, hereinafter referred to as the commission, an application for a permit "to construct and maintain a travel lift well, ramps, floats, mooring piles and [to] dredge an area to 6' at mean low water in front of . . . [the Vallerie] property . . . [on the] Norwalk River . . . as shown on . . . [an] attached plan". The application also stated that dredged material would be deposited in an approved spoil area in Long Island Sound and that a federal permit had been applied for from the army engineers.

In somewhat more detail, the application sought a permit (1) to construct a marina embracing three ramps, twenty-four feet by three feet, four lines of floats measuring from 120 feet by 5 feet to 200 feet by 5 feet with a total of twenty-one finger floats of from twenty feet by three feet to thirty feet by three feet, and sixty-eight mooring piles and then (2) to dredge approximately 5000 cubic yards of underwater material. The Norwalk River at the location in question is navigable, and, as shown on the plan accompanying the application, a United States Pier and Bulkhead line has been established. See 56 Am. Jur. 663, Waters, § 201.

On October 16, the commission, by Thomas H. Nash, a field inspector, wrote Vallerie that the permit requested would be considered under General Statutes § 25-7b, which, inter alia, requires the commission to consider pollution control, and that Vallerie would have to furnish information as to rules and regulations which he would enforce as to users of his marina regarding garbage, refuse and the use of heads on boats, as well as guarding against the spillage of petroleum products. Under date of October 23, Vallerie filed his proposed rules and regulations.

Nash reported to the commission that the site had been inspected, that it did not appear that the project would violate any applicable statute, and that the Shell Fish Commission, the Fish and Game Commission, the City Planning Commission of Norwalk, and the Building and Zoning Inspector of the city of Norwalk had each been notified and had made no objection. The report also pointed out that the adjoining property owners had been notified and that Attorney Sidney Vogel did object on their behalf, but Nash, notwithstanding the objection,

recommended to the commission that the application be approved and a certificate or permit be issued.

The objection of Attorney Vogel was expressed in a letter to the commission dated October 25, 1967, and may be summarized in abbreviated form. It stated that Attorney Vogel's law firm represented Norman and Hillard Bloom and Wallace H. Bell, Jr., who own and operate Bell's Boat Yard, which adjoins the Vallerie property on the north, and that the Blooms are also lessees and operators of the Tallmadge Brothers Oyster Company, which adjoins the Vallerie property on the south.

As to the Bell yard, the letter stated that the installation of piles and floats would prevent ingress or egress, except from the easterly side of the Bell property facing the channel, and that the proposed dredging would undermine a marine railway running along the southerly boundary of the Bell property.

As to the Tallmadge oyster operation, the letter stated that some oyster boats were sixty-five feet long and had a twenty-five-foot beam; that none of the smaller oyster boats had less than a fifteen-foot beam; that, in attempting to enter or leave the Tallmadge pier, such boats are often required, by conditions of wind or tide, to swing as far north as the most northerly side of the Vallerie pier; that in so doing they might strike and damage the smaller boats moored at the Vallerie marina; and that efforts to avoid this risk might force the Tallmadge operation out of business.

The letter concluded with a statement that, apparently for the reasons stated, the Vallerie proposal would constitute an impediment to navigation and an unwarranted interference with the proper

development and use of adjoining uplands and should be denied.

The letter also stated that "[s]hould the Commission schedule a hearing on the application, we will be prepared to attend and offer evidence in support of our objection".

On December 27, 1967, the commission issued a certificate or permit under General Statutes §§ 25-7b and 25-7d and sent a copy to the army engineers. The permit required that the work be completed on or before December 27, 1970, and that the commission be notified upon completion. It also contained a statement that the permit "is subject to and in no way derogates [sic] any present or future property or other rights or powers of the State of Connecticut, and conveys no property rights in real estate or material nor any exclusive privileges, and is further subject to any and all public and private rights and to any federal, state or local laws or regulations pertinent to the property or activity affected hereby".

On January 8, 1968, the army engineers issued a federal permit for the work, conditioned and restricted in a manner similar to that set forth in the commission's permit.[1]

From the commission's action in granting the permit, the plaintiffs, Norman and Hillard Bloom and Wallace H. Bell, Jr., on December 29, 1967, appealed to the Superior Court, joining Vallerie as a party defendant. From an adverse decision of the Superior Court, the plaintiffs took this appeal.

The basic complaint is that the commission should have held a hearing before acting on the applica-

---

[1] Although it appeared in the oral argument that the army engineers granted the federal permit without a hearing, the plaintiffs have made no attack on its validity.

tion for a permit, and this claim is based on two grounds: (1) Since the application seeks the dredging and removal of about 5000 cubic yards of underwater material, the application falls within the provisions of General Statutes §§ 25-10, 25-11 and 25-12, which require a public hearing before the issuance of a removal permit. (2) In any event the issuance of the permit was in essence an adjudicative proceeding directly affecting the rights of the plaintiffs, and thus due process required a hearing under cases (as plaintiffs claim) such as *Hannah* v. *Larche*, 363 U.S. 420, 441, 80 S. Ct. 1502, 4 L. Ed. 2d 1307, and *Reardon* v. *Dental Commission*, 128 Conn. 116, 119, 20 A.2d 622.

At the outset, it is important to bear in mind certain of the common-law rights of Vallerie. The state, as the representative of the public, is the owner of the soil between high- and low-water mark upon navigable water where the tide ebbs and flows. But Vallerie's ownership of the adjoining upland gave him certain exclusive yet qualified rights and privileges in the waters and submerged land adjoining, and in front of, his upland. *Rochester* v. *Barney,* 117 Conn. 462, 468, 169 A. 45. These rights included "the exclusive right to dig channels and build wharves from his land to reach deep water, so long as he does not interfere with free navigation". *Shorehaven Golf Club, Inc.* v. *Water Resources Commission,* 146 Conn. 619, 624, 153 A.2d 444.

(1)

It is apparent that the application for a permit sought nothing except "in front of" the Vallerie property. There is no claim, and nothing to indicate, that Vallerie seeks to place any installations on, or otherwise to interfere with, any submerged land ad-

joining the plaintiffs' upland. See cases such as *Rochester* v. *Barney,* supra, 469. There is nothing unreasonable or improper in digging the channel so as to have a minimum depth of six feet at mean low water. Indeed, anything much less in depth would obviously be inadequate safely to accommodate pleasure craft of the type the marina is intended to serve.

Although the applicable statutes are somewhat lacking in desirable clarity, looking at chapter 473 of the General Statutes as a whole, as we must, it is clear that part II (§§ 25-10—25-18), except for § 25-17,[2] is concerned with the removal of sand or gravel lying below the mean high-water mark (§ 25-11), that this is forbidden unless a permit has been obtained from the commission (§ 25-18); and that the commission shall hold a public hearing before granting any application for a removal permit. § 25-12. If part II of chapter 473 stood alone, there would be considerable force to the plaintiffs' claim that the dredging sought in the instant application for a permit brought it within the provisions of §§ 25-11 and 25-12 and that a public hearing was required. But § 25-7b authorizes the commission to regulate the erection of structures in tidal, coastal or navigable waters, and § 25-7d forbids the erection of "any structure" or the placement of "any obstruction or encroachment" or the conduct of "any dredging or other work incidental thereto" (i.e., incidental to the erection of a structure or the placement of any obstruction or encroachment in tidal, coastal or navigable waters) until an application for a permit has been made to, and granted by, the commission. Section 25-7d also provides that the commission

---

[2] There is no claim by anyone that General Statutes § 25-17, which authorizes an appeal from the commission, is not both general in its nature and applicable to any action taken by the commission.

shall give notice of the application to the chief executive officer and to the chairman of the planning and zoning commissions of each town "in which such structure is to be located". Such notice was given, and there is no claim that the provisions of § 25-7d as to notice were not followed by the commission. Indeed, it went far beyond them and notified the plaintiffs and, as already pointed out, other public authorities. The plaintiffs' claim as to the statutory requirement of a hearing is that § 25-12 rather than § 25-7d was applicable.

It does not appear that any dredging was contemplated by Vallerie except, in the language of § 25-7d, "incidental" to the erection of the marina in the manner described in the application and the provision for passage between the marina and the channel without which the marina would be unusable. There was no claim or justification for any claim that, as in *Shorehaven Golf Club, Inc.* v. *Water Resources Commission,* 146 Conn. 619, 625, 153 A.2d 444, the real purpose of Vallerie was to remove underwater material, and that the clearing of a channel was a subterfuge and a mere incident to an actual removal operation which would have required a permit under § 25-11. It follows that §§ 25-7b and 25-7d were, as the commission and Vallerie claimed, the applicable sections and that there was no statutory requirement of a public hearing.

(2)

The second claim of the plaintiffs, and that most strongly stressed and relied upon by them, is that the commission's action was adjudicative and thus required a prior hearing regardless of the absence of any statutory requirement.

In the first place, as already pointed out, Vallerie sought nothing which he did not have at common law. The plaintiffs make no claim that Vallerie sought to erect any pile or structure on their property or on that in which they have littoral rights. Rather, the plaintiffs' main claim really was that at times they could not maneuver their oyster boats up to their dock without swinging in front of the Vallerie pier and that in order that the plaintiffs might continue so to maneuver their oyster boats Vallerie would have to forgo the contemplated utilization of his own littoral rights. As to the marine railway, the plaintiffs seem to be claiming some right to its lateral support. If any such right exists, it would necessarily impair Vallerie's littoral rights. See cases such as *Ceffarelli* v. *Landino,* 82 Conn. 126, 129, 72 A. 564.

But the most important factor is that it is clear from the limitations in the permit issued by the commission that it grants no rights to Vallerie as against the plaintiffs or anyone else. As pointed out in *Shorehaven Golf Club, Inc.* v. *Water Resources Commission,* supra, 624, the common-law riparian rights are subject to reasonable police regulation in the interest of the public welfare and have been held subject to such regulation for many years. Such regulation is taking place here. See General Statutes §§ 25-7e, 25-7f. In other words, Vallerie's common-law rights, if anyone's, are curtailed by the statutes in question. The plaintiffs' rights, such as they are, remain, by the express terms of the permit, unaffected by it.[3]

The plaintiffs, when directly asked in oral argu-

---

[3] Whether, had Vallerie been denied the permit which he sought, without having been accorded a hearing, his constitutional rights would have been impaired is a matter not now before us.

ment, denied any claim that the failure of § 25-7d to require a hearing was, in and of itself, a fatal constitutional defect. Rather, they claimed that in this particular case the issuance of the permit, without according the plaintiffs a hearing, was a denial of due process as to them and, so, rendered the issuance of the permit an unconstitutional act on the part of the commission.

More specifically, the plaintiffs' claim was that the proceeding was adjudicative and, so, required a hearing, and this claim, in turn, is based on the plaintiffs' contention that the commission, in issuing the permit, was engaging in a quasi-judicial determination of the respective littoral rights of Vallerie and the plaintiffs, stemming from their respective ownership of adjoining uplands. For the reasons already pointed out, no such quasi-judicial determination took place or was attempted. The commission, like the army engineers, was determining to what, if any, extent, under the police power, there should be curtailment of Vallerie's common-law rights to wharf out and dredge to get access to the channel of the river. *New York, N.H. & H.R. Co.* v. *Long,* 72 Conn. 10, 21, 43 A. 559. This was not, at least as to the plaintiffs, an adjudicative procedure and did not purport to, nor did it, curtail any rights which the plaintiffs had. If the plaintiffs' rights were infringed, or threatened with infringement, by Vallerie, they can be protected, or damage to them redressed, in an appropriate action where, of course, the plaintiffs may be fully heard. *Edward Balf Co.* v. *Hartford Electric Light Co.,* 106 Conn. 315, 326, 138 A. 122; *Lane* v. *Smith Bros., Inc.,* 80 Conn. 185, 190, 67 A. 558; see also *Frink* v. *Lawrence,* 20 Conn. 117, 120; 56 Am. Jur. 1097, Wharves, § 45. To such an action the commission's permit to

Vallerie, by its own terms, would not constitute an effective defense.

For the foregoing reasons we conclude that the issuance of the permit to Vallerie was not an adjudicative action as to the plaintiffs such as to entitle them, as a requirement of due process, to a hearing.

There is no error.

In this opinion the other judges concurred.