JEROME RAPOPORT *v.* ZONING BOARD OF APPEALS
OF THE CITY OF STAMFORD ET AL.
(SC 18439)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan,
Eveleigh and Vertefeuille, Js.

Argued January 3—officially released May 24, 2011

*Brenden P. Leydon,* for the appellant (plaintiff).

*John W. Mullin,* assistant corporation counsel, with whom, on the brief, was *James V. Minor,* former assistant corporation counsel, for the appellees (named defendant et al.).

*Andrew J. McDonald,* with whom, on the brief, was *Charles K. Campbell, Jr.,* for the appellees (defendant Southfield Point Association, Inc., et al.).

*Opinion*

ZARELLA, J. The principal issue in this administrative appeal is whether the trial court properly upheld the decision of the named defendant, the zoning board of appeals of the city of Stamford (board),[1] affirming the decision of the defendant James J. Lunney III, the city zoning enforcement officer,[2] that a dock[3] located on the waters of Stamford Harbor was a neighborhood dock rather than a marina and, therefore, that improvements to the dock were not subject to the city's zoning regulations. The plaintiff, Jerome Rapoport, appeals

---

[1] The board is one of four defendants in this action. The other defendants are James J. Lunney III, the zoning enforcement officer of the city of Stamford, Southfield Point Association, Inc., which is the owner of Cook Street Extension, and Davenport Point Association, Inc., which, together with Southfield Point Association, Inc., is the owner of the dock. Hereinafter, we refer to the two associations collectively as the associations and to all four defendants collectively as the defendants.

[2] We hereinafter refer to Lunney as the zoning enforcement officer.

[3] All references to the dock in this opinion include pilings, piers, floats, ramps, finger docks and gangways.

from the judgment of the trial court upholding the board's decision on the ground that all of the dock improvements were located waterward of the mean high water line[4] and that certain adjoining property (Cook Road Extension) was used exclusively as a road to provide access to the dock. The plaintiff claims that the trial court improperly upheld the board's decision because (1) the use of a property for any purpose, riparian or otherwise, must have a basis in the regulations in order to be allowed under a permissive zoning scheme like that of the city of Stamford (city), and (2) the use of Cook Road Extension to secure the dock to the land and to serve as the sole means of access to and parking for the dock is itself a use that must have a foundation in the zoning regulations. The defendants respond that the trial court properly upheld the board's decision because (1) a municipality normally has no jurisdiction to regulate activities waterward of the mean high water line, (2) the connection between the dock and Cook Road Extension is waterward of the mean high water line, and (3) the city's zoning regulations

[4] The "mean high water mark" is "the average of all high tide elevations based on [a nineteen] year series of tide observations . . . . The mean high water mark delineates the seaward extent of private ownership of upland property as well as the limits of municipal jurisdiction for regulating upland development projects; the [s]tate of Connecticut holds title as trustee to the lands waterward of the mean high water [mark] . . . ." (Citation omitted; internal quotation marks omitted.) *Grannis Island* v. *Plan Commission*, Superior Court, judicial district of New Haven, Docket No. CV-00-04458875 (January 17, 2002); see also *Rochester* v. *Barney*, 117 Conn. 462, 468, 169 A. 45 (1933) (state owns property between high and low watermarks on navigable water "where the tide ebbs and flows"); Office of the Long Island Sound Programs, "Fact Sheet for State and Municipal Regulatory Jurisdictions," p. 2, n.3 ("the 'mean high water' line is a line on the shore established by the average of all high tides and the boundary of the public trust area based on the common law public trust doctrine"), reprinted in Connecticut Dept. of Environmental Protection, Connecticut Coastal Management Manual (September, 2000) § 1, available at http://www.ct.gov/dep/lib/dep/long_island_sound/coastal_management_manual/manual_section_1_08.pdf (last visited May 6, 2011).

do not apply to Cook Road Extension. We affirm the judgment of the trial court.

The following relevant facts and procedural history are set forth in the trial court's memorandum of decision. "The property in question is located in [a residential] zone . . . in an area commonly known as Southfield Point. The Southfield Point subdivision map recorded in the Stamford land records lays out [several] roads . . . . They are private roads. Southfield Avenue services a portion of the subdivision. Residential lots are laid out fronting on each of those streets. Cook Road runs in an easterly direction from Southfield Avenue to its intersection with Davenport Drive. Cook Road then continues beyond Davenport Drive easterly a short distance between two lots to the shorefront of Stamford Harbor, a portion of Long Island Sound. . . . [T]his section of Cook Road [is known] as Cook Road Extension. . . . Sometime after the subdivision was recorded, single-family houses were built on the subdivision lots. . . . [A]ssociations were later formed with [their] membership limited to the property owners in the Southfield Point subdivision. There are eighty-seven association members. These owners, as members of the . . . [a]ssociations, use Cook Road Extension for access to Stamford Harbor . . . . Various docks, pilings and other improvements were constructed over the years at the end of Cook Road Extension. The members of the . . . associations alone have the right to use Cook Road Extension and the dock,[5] not the general public. . . .

---

[5] The trial court further explained: "Most deeds in the subdivision contain the following language or its equivalent: 'Together with a right of way for all lawful purposes in common with others over Cook Road and the other improved streets or roads laid out on Southfield Point, [the owner has] the right to use the dock at the easterly terminus of . . . Cook Road . . . .' The deed that contains this language is . . . from . . . Southfield Point Company to Earle Farnell, dated July 27, 1925, and recorded in the Stamford land records on July 30, 1925. A chart containing similar deed restrictions for other Southfield Point subdivision property is in the record."

"Directly to the south of Cook Road Extension is the single-family house . . . owned by the plaintiff . . . . The plaintiff's property abuts and is within 100 feet of Cook Road Extension and the dock. At all times referenced and to this date, the plaintiff has been the record title owner of [this property]."[6]

"On June 17, 2004 . . . an attorney . . . acting on behalf of the plaintiff . . . wrote a six page letter to . . . the zoning enforcement officer . . . regarding Southfield Point Association [Inc., and its recent expansion of the dock]. The letter was headed: 'Southfield Point Association, Inc., Multi User Dock/Marina Extension End of Cook Road, Stamford, CT.' The letter concluded as follows:

" 'Without question, the [Southfield Point] multi-user dock presents a complicated zoning compliance question. While the actual dock structures themselves are primarily beyond the high water line, the impact on the uplands and surrounding properties caused by the expanded use of the dock should not be ignored. The dock must be investigated, and I am confident you will agree that zoning enforcement action should be taken. If your office determines the previous dock to be a preexisting, nonconforming use, then the new dock is an illegal expansion of that nonconformity, and your office should issue a cease-and-desist order requiring [Southfield Point Association, Inc.] to remove the new dock and return the site to its previous condition. If,

---

[6] According to a letter dated January 5, 2005, from the associations to the zoning enforcement officer, the plaintiff purchased his property in November, 1992. Considered together with the fact that the plaintiff is protesting the expansion of the dock in 2004 under a permit granted by the state department of environmental protection in 2002, which was amended in 2003, we construe his complaint as referring to the improvements constructed pursuant to that permit and not to any improvements that may have been made prior to that time. The trial court similarly noted in its memorandum of decision that the plaintiff's appeal arose in connection with these more recent improvements.

on the other hand, you determine the dock to be an existing use permitted as a special exception, then you should still issue a cease-and-desist order pending approval of a special exception by the [board]. Either way, this dock should not escape scrutiny by the city's zoning officials. . . .'

"The June 17, 2004 letter also discussed the eastern end of Cook Road. It mentions [Cook Road Extension] at that location as being 60 feet wide and approximately 200 feet long from Davenport Drive to Stamford Harbor. . . .

"A May 3, 2005 opinion from [the zoning enforcement officer] was issued in response to that June 17, 2004 letter. In its final paragraph, the May 3, 2005 letter states: 'The result of corporation counsel's review was that the dock was not governed by this office because it is governed by the state. It is also the determination of the [city office of legal affairs][7] that the dock was a

[7] In a memorandum dated August 24, 2005, from James V. Minor, the city's assistant corporation counsel, to the zoning enforcement officer, Minor reaffirmed in writing the opinion that he had expressed in prior discussions with the zoning enforcement officer. He explained in relevant part: "This will confirm that I have discussed this with you, and reviewed [related] letters . . . and a previous lawsuit involving [Southfield Point Association, Inc.] and [the plaintiff] to answer the question of whether you have jurisdiction to issue a [c]ease and [d]esist [order] because the claim is that an old 'marina' is being rebuilt and expanded without a zoning permit.

"The question is [whether] it [is] a marina that requires parking according to [article IV, § 12 D (13), of the Stamford zoning regulations], which requires a certain number of parking spaces for a 'marina' for each mooring/slip/or other unit accommodating a boat or vessel, when the . . . dock is limited to owners of property in the . . . [a]ssociations; access is by private roads that are not open to the public or maintained by [the city]; there are rights to use the dock in deeds that go back 100 years; and there is no parking allowed [for] anyone except those people who drop off their beach/boat supplies and then park in their own driveway, by rule of [the Southfield Point Association, Inc.].

"The answer is no, since this is a community dock, not a marina that requires parking, based upon the past history of use, the physical set up that restricts use to the immediate homeowners in [Southfield Point], and past practice of not requiring a permit or parking for a similar private or community dock.

neighborhood dock and not a marina and, therefore, not addressable under the zoning regulations.' At the August 24, 2005 public hearing, [the zoning enforcement officer] restated his decision: 'The decision was that I'm not going to tell them that they have to come before the board.' 'I did not have the authority to make them come before the board.' . . .

"On June 1, 2005, the plaintiff . . . filed an appeal with the [board] stating: 'Decision of the zoning enforcement officer dated May 3, 2005 is appealed because . . . Southfield Point Association, Inc., acting alone or in concert with Davenport Point Association, Inc., has over time expanded a nonconforming use, all as more specifically set forth in schedule A attached hereto and made a part hereof.' Attached as schedule A appears to be the June 17, 2004 plaintiff's attorney's letter and [the zoning enforcement officer's] May 3, 2005 letter. The application described the subject premises: '[Cook Road Extension] . . . and littoral rights beyond.' The application further indicated that the following structures and uses presently exist: 'Bulkheads, pilings, piers, gangways, docks, launching ramp.' A legal notice was published by the [board] for the public hearing, which stated: 'Application . . . of [the plaintiff] of an appeal of the zoning enforcement officer's decision in determining the dock . . . was a neighborhood dock and not a marina and not addressable under the zoning

---

. "The [Southfield Point Association, Inc.] letter states that it received permission to build the dock from [the state department of environmental protection]; this dock has up to [twenty-one] slips for small boats. The letter also states that it discussed this project with [two officials in the city planning department] and both said [that] no permit was necessary since it was a 'community dock.'

"I agreed that there is no need for a permit since this is not a 'marina'—it is not open to the public. No member of the public (except for an association member) can use it. It does not rent or sell marina products. It is limited to only members of the [associations], and only people who live [there] can use the slips."

regulations. [The] property [is] located on the east side of [the] Davenport Drive-Cook Road intersection comprising the [Cook Road Extension] and littoral rights beyond in a [residential] zone.' The [board] held public hearings on August 24, 2005, and September 19, 2005 . . . [and subsequently] upheld the decision of the zoning enforcement officer that the dock and immediate area [were] not subject to the . . . zoning regulations.

"The formal decision of the [board] dated November 10, 2005, is as follows: 'The [board] voted to uphold the zoning enforcement officer's decision . . . in determining the dock . . . was a neighborhood dock and not a marina and not addressable under the zoning regulations.' "

The plaintiff appealed to the trial court from the board's decision. In its memorandum of decision, the court identified "three specific areas that were the subject of the zoning enforcement officer's decision, the [board] hearing and decision, and [the] appeal [to the trial court]." These three areas were (1) Cook Road Extension, (2) the dock improvements lying directly on the waters of Stamford Harbor, and (3) the connection between the dock and Cook Road Extension.

After determining that the plaintiff was aggrieved, the trial court stated, with respect to Cook Road Extension, that there was substantial evidence in the record to support the board's determination that Cook Road Extension was a road used exclusively for vehicular and pedestrian access to the dock. The court then made the legal determination that the board properly had applied the law of permissive zoning in upholding the zoning enforcement officer's determination that, because Cook Road Extension contained ordinary and routine egress and access improvements and was used exclusively as a road, it was not subject to the city's zoning regulations.

The court next considered the dock improvements located on the waters of Stamford Harbor and concluded that there was substantial evidence in the record to support the board's determination that the dock, floats, fingers and pilings were waterward of the mean high water line. The court also concluded that the dock improvements were not subject to the city zoning regulations as a matter of law because the city had not approved a harbor management plan pursuant to statutory authority,[8] and, therefore, the state had exclusive jurisdiction over activities waterward of the mean high water line.

The trial court finally addressed the connection between the dock and the area landward to the terminus of Cook Road Extension. The court reiterated its prior conclusion that the city lacked authority under its zoning regulations to control structures waterward of the mean high water line and concluded that the record contained substantial evidence that the connection between the dock and Cook Road Extension was waterward of the mean high water line. The court thereafter determined as a matter of law that none of the areas examined was governed by the city's zoning regulations.

The plaintiff subsequently filed a motion to reargue. The trial court granted the motion but denied the relief

[8] The state has granted municipalities located adjacent to Long Island Sound authority to regulate activities waterward of the mean high water line. Specifically, General Statutes § 22a-113k (a) permits municipalities to establish a harbor management commission, which "shall designate the area within the territorial limits of the municipality and below the mean high water that shall be within the jurisdiction of a commission . . . ." General Statutes §§ 22a-113m and 22a-113n further provide a harbor management commission with authority to enact a harbor management plan, which may include "provisions for the orderly, safe and efficient allocation of the harbor for boating . . . ." General Statutes § 22a-113n (a). When a municipality has enacted such a plan, and the commissioner of environmental protection has approved it, any recommendation made pursuant to that plan becomes binding. General Statutes § 22a-113n (b).

requested. The trial court thereafter rendered judgment denying the plaintiff's appeal. This appeal followed.[9]

On appeal, the plaintiff claims that the trial court improperly upheld the board's decision that the associations' construction of a 196 foot dock and the use of Cook Road Extension for access to and connection with the dock are entirely immune from local zoning regulation merely because they relate to a water dependent use. The defendants respond that the trial court properly upheld the board's decision because the dock and its intersection with Cook Road Extension are located waterward of the mean high water line, where the city normally has no jurisdiction, and because the zoning regulations do not apply to activities that take place on Cook Road Extension. We agree with the defendants that the trial court properly upheld the board's decision.

We first set forth the standard of review. Judicial review of an administrative agency's decision differs depending on whether the court is reviewing a factual or a legal determination. When "the administrative agency has made a factual determination, the scope of review *ordinarily* is expressed in such terms as substantial evidence or sufficient evidence." (Emphasis in original; internal quotation marks omitted.) *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, 256 Conn. 674, 721, 780 A.2d 1 (2001). Under this standard, the "[c]onclusions reached by [the board] must be upheld by the [reviewing] court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [board]. . . . The question is not whether the [reviewing] court would

---

[9] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

have reached the same conclusion . . . but whether the record before the [board] supports the decision reached. . . . If a [reviewing] court finds that there is substantial evidence to support a zoning board's findings, it cannot substitute its judgment for that of the board. . . . If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Internal quotation marks omitted.) *Rural Water Co.* v. *Zoning Board of Appeals*, 287 Conn. 282, 294, 947 A.2d 944 (2008).

When the administrative agency has made a legal determination, however, the scope of review is ordinarily plenary. *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, supra, 256 Conn. 721. "Generally, it is the function of a zoning board . . . to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. [In turn] [t]he trial court ha[s] to decide whether the board correctly interpreted the [applicable regulations] and applied [them to the facts] with reasonable discretion . . . . In applying the law to the facts of a particular case, the board is endowed with . . . liberal discretion, and its action is subject to review . . . only to determine whether it was unreasonable, arbitrary or illegal. . . . [T]he plaintiffs bear the burden of establishing that the board acted improperly." (Citations omitted; internal quotation marks omitted.) *Wood* v. *Zoning Board of Appeals*, 258 Conn. 691, 697–98, 784 A.2d 354 (2001).

"Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence,

the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . .

"Finally, zoning regulations are local legislative enactments . . . and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes. . . . Thus, in construing regulations, our function is to determine the expressed legislative intent. . . . Moreover, regulations must be interpreted in accordance with the principle that a reasonable and rational result was intended . . . and the words employed therein are to be given their commonly approved meaning." (Citations omitted; internal quotation marks omitted.) Id., 698–99.

We add that where, as here, a plaintiff's "appeal to the trial court is based solely on the record, the scope of the trial court's review of the [board's] decision and the scope of our review of that decision are the same." (Internal quotation marks omitted.) *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, supra, 256 Conn. 726 n.29.

In the present case, the board "voted to uphold the [z]oning [e]nforcement's [o]fficer's [determination that] the dock . . . was a neighborhood dock and not a marina and not addressable under the [z]oning [r]egulations" but gave no reason for its decision. "[W]hen a [board] gives no reason for its decision, the [reviewing] court must search the entire record to find a basis for the [board's] decision . . . ." (Internal quotation marks omitted.) *Gibbons* v. *Historic District Commission*, 285 Conn. 755, 770, 941 A.2d 917 (2008). Accordingly, in order to address the plaintiff's claim that the board improperly upheld the zoning enforcement officer's determination that the dock improvements and the use of Cook Road Extension were not subject to the zoning regulations, we initially must examine the record to ascertain the board's underlying factual findings and

whether such findings were supported by substantial evidence. We then exercise our plenary review to determine whether the board properly upheld the zoning enforcement officer's determination that the city's zoning regulations were inapplicable in light of the board's factual findings.[10]

# I

## COOK ROAD EXTENSION

The plaintiff first claims that the board improperly concluded that Cook Road Extension was not subject to the city's zoning regulations merely because it was related to a water dependent use. We have reviewed the transcript of the board's meeting on October 26, 2005, in which it considered and decided the plaintiff's appeal,[11] and conclude that the board made several factual findings[12] regarding Cook Road Extension. Specifically, the board found that the use of Cook Road Extension following expansion of the dock was consistent with its past use as a "staging area" or vehicular "drop-off point" for the loading and unloading of persons, equipment and boats, and that a decades old prohibition against parking on Cook Road Extension, except for drop-off purposes, had been maintained. Thus, the board found that the principal use of Cook Road Exten-

---

[10] We follow the board's analysis and divide our discussion into two parts, the first of which will focus on Cook Road Extension and the second of which will focus on improvements to the dock.

[11] The meeting, which was attended by board members only, took place on October 26, 2005, following two days of hearings on August 24, 2005, and September 19, 2005, which were attended by the zoning enforcement officer and representatives of the parties.

[12] We regard as factual findings only those descriptive statements about Cook Road Extension and the dock with which all board members appear to have agreed. We do not include as factual findings any descriptive statements with which all board members did not appear to agree, or any descriptive statements by individual board members to which only some or no members responded.

sion as a means of access to the dock had not changed as a result of the dock expansion.

We further conclude that the record contains substantial evidence in support of these factual findings. As the trial court indicated upon reviewing photographs, deeds, official city documents and correspondence between the parties and city officials, "[t]he record demonstrates that there were no structures located on Cook Road Extension. Photographs in the record . . . show pavement, curbing, grass, shrubbery, two planters, each with a small decorative tree, two low fence sections with privacy signs, a small safety fence on the seawall and a flagpole. There is nothing on Cook Road Extension that is inconsistent with its use . . . for access of vehicular and pedestrian traffic coming from Davenport Drive to the waters of Stamford Harbor . . . ."

In addition, the associations' "rules and regulations," which were admitted as an exhibit during the hearings before the board, provide that parking on Cook Road Extension must "be of a transient nature. No extended parking will be allowed. Boat owners are expected to remove their car and trailer from [Cook Road Extension] after launching their boat. No boat passenger shall be allowed to leave vehicles at [Cook Road Extension]." The record also contains a written memorandum from the city's assistant corporation counsel to the zoning enforcement officer, dated August 24, 2005, stating that "no parking [is] allowed [on Cook Road Extension for] anyone except those people who drop off their beach/ boat supplies and then park in their own driveway, by rule of [Southfield Point Association, Inc.] . . . ." A letter from the associations to the zoning enforcement officer, dated January 5, 2005, describing the history of Cook Road Extension and the dock, likewise refers to the facts that the associations' rules and regulations prohibit permanent parking in the area, that "every property in the area has a deeded property right to . . .

traverse . . . and access the water via [Cook Road Extension]" and that the "[u]se of [Cook Road Extension] for access to the water, docking and recreational boating by the community dates back to [the 1920s]." Accordingly, the foregoing evidence is entirely consistent with the board's factual findings relating to Cook Road Extension.

On the basis of its findings, the board further determined that Cook Road Extension was not subject to the city's zoning regulations merely because of the proposed improvements to the dock. In making this determination, the board had before it certain undisputed, historical facts set forth in the letter dated January 5, 2005, from the associations to the zoning enforcement officer and verified in the exhibits attached thereto. These facts, which have significant legal implications in this context, include the following: "The earliest subdivision of the area that now comprises the [associations] began in 1904. . . . Map 159 [in the Stamford land records] shows a subdivision of what is now Cook Road and includes [Cook Road Extension] which is dedicated as follows: '[COOK ROAD EXTENSION] FOR BENEFIT OF ALL LOT OWNERS WITH RIGHT OF WAY TO THE WATER.' Numerous homeowners on Cook Road trace their deeds back to [m]ap 159 and have express grants to [Cook Road Extension] and right of way to the water.

"In 1914 a subdivision map of the entire area now comprising [the associations] was filed by the Southfield Point Company. . . . This map was superseded by a map filed by the Southfield Point Company in 1925 and is designated as map 1143 in the Stamford land records . . . . Southfield [Point] Company and subsequent owners of the development deeded rights to [Cook Road Extension] to each property as it was sold.

"Deeds dating as far back as 1925 . . . include express reference to, and [a] grant of rights to, docks extending from [Cook Road Extension]. . . .

"When [Southfield Point Association, Inc.], the title-holder to [Cook Road Extension], was formed in 1928, in addition to functions such as maintenance and repair of the private roads, protection of the interests of property owners, enforce[ment] [of] restrictions affecting the property, etc., the express intent to 'erect [and] maintain docks [and] wharves' at [Cook Road Extension] was established in its articles of incorporation, and memorialized in the Stamford [l]and [r]ecords . . . . Use of [Cook Road Extension] for access to the water, docking, and recreational boating by the community dates back to those times."

We conclude that the board properly determined that expansion of the dock had no effect on the use of Cook Road Extension as a means of access to the water. Cook Road Extension apparently had been designated for that purpose as early as 1904 on a map filed in the Stamford land records. Moreover, the right to use Cook Road Extension for such a purpose has been deeded since that time to most, if not all, association members, and, thus, Cook Road Extension has been used by association members as a means of gaining access to the water for approximately 100 years. In addition, there is no evidence in the record that the dock improvements authorized by the state department of environmental protection in 2002 and 2003 either required or resulted in any physical changes to Cook Road Extension that would have necessitated approval by the zoning enforcement officer.[13] Furthermore, article I, § 2 B, of the Stamford zoning regulations, which were adopted

---

[13] Article I, § 1 A, of the Stamford zoning regulations describes the purpose of the regulations and provides in relevant part: "The purpose of this Zoning Code is . . . to designate, regulate and restrict the location and use of buildings, structures and land for agriculture, residence, commerce, trade, industry or other purposes; to regulate and limit the height, number of

by the city pursuant to the provisions of chapter 43 of the 1949 Revision of the General Statutes, as amended,[14] and the charter of the city of Stamford on November 30, 1951; *Neuger* v. *Zoning Board,* 145 Conn. 625, 627, 145 A.2d 738 (1958); provides that the regulations are not intended to interfere with any rules, regulations or permits, previously adopted or issued, relating to the use of buildings or premises.[15] Accordingly, because Cook Road Extension had been used as a means of access to Stamford Harbor for many decades before the adoption of the city's zoning regulations in 1951, and there was no change in that use or in the physical character of Cook Road Extension as a result of the dock's expansion, we conclude as a matter of law that the zoning enforcement officer had no reason or author-

---

stories and size of buildings and other structures hereafter erected or altered; to regulate and determine the size of yards and other open spaces; and to regulate and limit the density of population; and for said purposes to divide the city into zoning districts of such number, shape and area as may be deemed best suited to carry out these regulations and provide for their enforcement, all in accordance with . . . the General Statutes . . . ." This statement of purpose makes no reference to the use of land for access ways. Such references are made, however, in statutes defining the functions of municipal planning commissions. See, e.g., General Statutes § 8-23 (e) (1) (B) (plan of conservation and development shall "provide for a system of principal thoroughfares, parkways, bridges, streets, sidewalks, multipurpose trails and other public ways as appropriate"); General Statutes § 8-25 (a) (municipal planning commission shall adopt regulations covering subdivision of land and providing that "the proposed streets are in harmony with existing or proposed principal thoroughfares shown in the plan of conservation and development," that proposed streets are "so arranged and of such width, as to provide an adequate and convenient system for present and prospective traffic needs" and that "open spaces, parks and playgrounds shall be shown on the subdivision plan").

[14] See General Statutes (1949 Rev.) §§ 836 through 848, as amended by General Statutes (Sup. 1951) §§ 156b through 163b.

[15] Article I, § 2 B, of the Stamford zoning regulations provides in relevant part: "It is not intended by these regulations to repeal, abrogate, annul or in any way to impair or interfere with any existing provisions of law or regulation, or covenants or with any rules, regulations or permits previously adopted or issued pursuant to law relating to the use of buildings or premises . . . ."

ity to regulate Cook Road Extension on the basis of the proposed dock improvements.

The plaintiff argues that the trial court improperly determined that Cook Road Extension was not subject to the city's zoning regulations because the use of land for access to another off-site use is a distinct use that, under the city's permissive zoning scheme, must be regulated if it is not expressly permitted, as in the present case.[16] We disagree. As previously noted, in the absence of any proposed change in the use or physical character of Cook Road Extension, there was nothing new to be regulated.

## II

### IMPROVEMENTS TO THE DOCK

The plaintiff also claims that the board improperly concluded that the dock improvements were not subject to the city's zoning regulations. On the basis of our review of the transcript of the hearings, we conclude that the board made only one factual finding relating to the dock, namely, that any and all changes connected

---

[16] The plaintiff also contended during oral argument, for the first time, that Cook Road Extension would be used more intensively as a result of the dock improvements because, in light of the larger scale of the dock, more of the premises would be used for winter storage when the ramp and floating docks were removed from the water. "It is well settled that claims on appeal must be adequately briefed . . . and cannot be raised for the first time at oral argument before the reviewing court." *Grimm* v. *Grimm*, 276 Conn. 377, 393, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006). Accordingly, we do not address this claim. To the extent the plaintiff also claims that Cook Road Extension will be used more intensively because the dock improvements increased the number of boat slips that previously had existed, we disagree. As assistant corporation counsel noted in his memorandum to the zoning enforcement officer, the only persons who have access to the dock are the associations' members, whose rights of access are contained in deeds that go back approximately 100 years. Thus, we conclude that Cook Road Extension is not being used more intensively as a result of the dock expansion because the expansion had no effect on the number of association members who use Cook Road Extension as a means of access to the dock.

with the dock's expansion were waterward of the mean high water line. Accordingly, our next task is to determine whether this finding was supported by substantial evidence.

As the trial court noted, the board had before it documentary evidence of prior approved permits and certificates, including a 2002 permit and a 2003 certification of permission issued by the state department of environmental protection, that gave rise to the plaintiff's complaint. See footnote 6 of this opinion. The permit that was granted on December 12, 2002, authorized the associations to retain certain "existing structures located waterward of the high tide line," including a 20 foot long concrete pad adjacent to the southern property line, a 38.5 foot long concrete boat ramp directly north of the concrete pad, a stone and concrete seawall approximately 35 feet long, parallel to the shoreline and north of the concrete boat ramp, 15 feet of riprap at the waterward terminus of the concrete pad, and 35 feet of riprap approximately 10 feet wide and waterward of the stone and concrete seawall. In addition to granting the associations permission to remove an existing 6 by 22 foot fixed pier, two concrete blocks used to support the pier and an existing 4 by 14 foot concrete pad located waterward of the seawall, the permit allowed the installation of a 60 foot long fixed, elevated pier, a 24 foot long wooden ramp and several floats, for a total length of 176 feet waterward of the high tide line.

On August 29, 2003, the state department of environmental protection issued a certificate of permission (certificate) to modify certain construction details authorized by the 2002 permit. Among other things, the certificate permitted an increase from eight to twelve in the number of wooden piles supporting the elevated fixed pier, the installation of an aluminum ramp instead of the previously authorized wooden ramp, and a

change in the projected angle of the proposed structure to reposition it perpendicular to the shoreline. The certificate left unchanged all conditions in the 2002 permit relating to the retention and removal of existing structures located waterward of the mean high water line.

We conclude from an examination of the maps, diagrams and plans submitted with the permit application, and from a review of all the other documents in the record, that there was substantial evidence to support the board's finding that all of the dock improvements made pursuant to the 2002 permit and the 2003 certificate were located waterward of the mean high water line. The foregoing documents identify the mean high water line as 4.4 feet in elevation. Existing structures to be *retained* are described by the permit and shown by the plans as being located waterward of the mean high water line, and include the concrete pad, concrete boat ramp, stone and concrete seawall[17] and thirty-five foot strip of riprap. In light of the foregoing and the fact that all of the dock improvements were installed waterward of the stone and concrete seawall, which was identified in the 2002 permit as being located waterward of the mean high water line, the record supports the board's finding that all of the dock improvements were located waterward of the mean high water line.

The board also made a legal determination that the city's zoning regulations did not apply and that the zoning enforcement officer had no jurisdiction over expansion of the dock because the state had exclusive jurisdiction to regulate activities waterward of the mean high water line. In addition, the board determined that the dock did not constitute a marina or a yacht club, which are uses governed by the city's zoning regulations. We agree with the board.

_____
[17] We discuss the accuracy of the permit documents with respect to the location of the seawall subsequently in this opinion.

"We begin by reasserting the accepted principle that a municipality's zoning powers are limited by the zoning statutes and the municipality's zoning regulations. As a creature of the state, the . . . [city] . . . can exercise only such powers as are expressly granted to it, or such powers as are necessary to enable it to discharge the duties and carry into effect the objects and purposes of its creation. . . . In other words, in order to determine whether [a] regulation . . . [is] within the authority of the commission to enact, we do not search for a statutory prohibition against such an enactment; rather, we must search for statutory authority for the enactment." (Citations omitted; internal quotation marks omitted.) *Upjohn Co.* v. *Zoning Board of Appeals*, 224 Conn. 96, 100, 616 A.2d 793 (1992).

Under existing law, the state has exclusive jurisdiction to regulate activities waterward of the mean high water line. See General Statutes § 22a-359 et seq. General Statutes § 22a-359 (a) provides in relevant part that "[t]he Commissioner of Environmental Protection shall regulate dredging and the erection of structures and the placement of fill, and work incidental thereto, in the tidal, coastal or navigable waters of the state waterward of the high tide line. . . ." If a person wishes to engage in any of the activities described in § 22a-359 (a), he or she first must file an application with the commissioner of environmental protection to secure permission to carry out that work. See General Statutes § 22a-361 (a).

There is one notable exception to this rule. "The state has manifested its intent to delegate to municipalities located adjacent to Long Island Sound a part of the duty to regulate waterward of the mean high water mark. General Statutes § 22a-113k (a) permits municipalities . . . to establish a harbor management commission, which shall designate that area within the territorial limits of the municipality and below the mean

high water that shall be within the jurisdiction of a commission . . . . Pursuant to [General Statutes] § 22a-113m, a harbor management commission has the authority to enact a harbor management plan, which may include provisions for the orderly, safe and efficient allocation of the harbor for boating . . . . General Statutes § 22a-113n (a). When a municipality has enacted such a plan, and the commissioner of environmental protection has approved it, any recommendation made pursuant to that plan becomes binding. General Statutes § 22a-113n (b); see also General Statutes § 22a-361 (c)." (Internal quotation marks omitted.) *DiPietro* v. *Zoning Board of Appeals*, 93 Conn. App. 314, 320–21, 889 A.2d 269, cert. denied, 277 Conn. 925, 895 A.2d 796 (2006).

In the present case, a harbor management commission (commission) existed in the city at the time of the zoning enforcement officer's decision in 2005, but the commission had not yet prepared and adopted a harbor management plan.[18] Accordingly, in the absence of a harbor management plan, we conclude that neither the commission nor any other municipal officer or board had authority to regulate the dock expansion because all of the dock improvements were located waterward of the mean high water line and, therefore, were governed solely by the state.

We also agree with the board's determination that the dock was not used as a marina, a yacht club or for boat storage and repair, all of which are uses to which

[18] During its meeting on October 26, 2005, to discuss the plaintiff's appeal, board members referred to the city's "harbor water management group" and indicated that, although the group "technically exist[ed]," it had "never started . . . ." At another point, a board member commented that the group had not met and "had nothing to do with this case." At the conclusion of the meeting, board members agreed that further discussion should be conducted with other city officials regarding the need for regulation of activities in Stamford Harbor like those in the present case.

the zoning regulations refer. Although a marina is not a listed use, it is mentioned in connection with parking. Specifically, article IV, § 12 D (13), of the Stamford zoning regulations, entitled "Automobile Parking and Loading Space," provides in relevant part that "[p]arking space for one and one-half (1 1/2) vehicles shall be provided in the case of a [m]arina for each mooring, slip or other unit accommodating a boat or vessel in the water." The regulations, however, do not define a marina. Consequently, although assistant corporation counsel stated in his memorandum to the zoning enforcement officer that the dock improvements did not constitute a marina, thereby indicating that such a use was covered under the regulations, it is difficult to determine whether that judgment was correct without further guidance. We therefore turn to the commonly accepted meaning of the term "marina"; see *Wood* v. *Zoning Board of Appeals*, supra, 258 Conn. 701–702 (relying on dictionary definition to understand undefined terms in zoning regulations); and a review of Connecticut cases in which marinas are discussed.

The American Heritage Dictionary of the English Language (3d Ed. 1992) defines a marina as "[a] boat basin that has docks, moorings, supplies, and other facilities for small boats." Connecticut cases involving marinas have further described them as commercial enterprises engaged in activities such as the servicing and repair of boats and boat engines, and the storing and selling of boats, vessels or yachts. See *Hackett* v. *J.L. G. Properties, LLC*, 285 Conn. 498, 499–500, 940 A.2d 769 (2008) (describing subject property as "commercial marina" on shore of Candlewood Lake); *French* v. *Clinton*, 215 Conn. 197, 199, 575 A.2d 686 (1990) (describing proposed "conceptual marina site plan" as facility available to public that would provide boat slips and year round and winter boat storage); *Pilot's Point Marina, Inc.* v. *Westbrook*, 119 Conn. App. 600, 601, 988 A.2d 897 (2010)

(describing subject property, "one of New England's largest marinas," as "deriv[ing] income from slip rentals, summer and winter boat storage, and the rental of industrial, commercial and residential building space"); *Reichenbach* v. *Kraska Enterprises, LLC*, 105 Conn. App. 461, 464, 938 A.2d 1238 (2008) (describing marina as "boat service business" providing storage for boats, vessels and yachts); *Dodson Boatyard, LLC* v. *Planning & Zoning Commission*, 77 Conn. App. 334, 335–36, 823 A.2d 371 (describing "full service" marina as commercial operation containing building used for workshop, storage of equipment and supplies, and storage and repair of boats), cert. denied, 265 Conn. 908, 831 A.2d 248 (2003); *Keefe* v. *Norwalk Cove Marina, Inc.*, 57 Conn. App. 601, 602, 749 A.2d 1219 (describing marina as corporation), cert. denied, 254 Conn. 903, 755 A.2d 881 (2000).

The dock improvements in this case consisted of a pier, ramps, pilings, dinghy dock, floats and fingers. The plans also show an existing hydromoist boat lift located near the dock improvements but no supplies or facilities that would appear to satisfy the definition of a marina.[19] Moreover, as assistant corporation counsel indicated in his memorandum to the zoning enforcement officer, use of the dock is limited to owners of property in the two associations, access is by private roads that are not open to the public or maintained by the city, rights to use the dock are expressed in deeds that go back approximately 100 years, no parking is allowed to anyone except those persons who drop off their boating supplies and park in their own driveway under the associations' rules and regulations, and the dock or its improvements are not being used for the rental or sale of marina products. Thus, the dock

---

[19] We note that, although the record contains evidence that members of the associations pay fees to use the boat slips, that fact alone is not indicative of whether a dock may be considered a marina.

improvements do not appear to constitute the type of enterprise normally associated with a marina, and we conclude as a matter of law that the zoning enforcement officer had no authority to regulate the dock improvements in this case on the ground that they constituted a marina.

We also conclude as a matter of law that the dock improvements did not constitute a yacht club, which, together with country clubs, golf clubs and beach clubs, is described in article II, § 3 A (27), of the Stamford zoning regulations as "[a] voluntary or corporate association whose objectives, pursuits and purposes are social or recreational, maintained on land owned or leased by it . . . ." The regulations provide that the principal use of a yacht club is for "[d]ocks, anchorage and mooring space," although accessory uses are also permitted. Stamford Zoning Regs., art. II, § 3 A (27). These include "[t]ennis courts, swimming pools and other recreational facilities usually afforded by any such club . . . . Buildings and accessory accommodations necessary or desirable for the exercise of the club's objectives, pursuits and purposes may be maintained. . . . Notwithstanding anything contained herein, a [y]acht [c]lub may contain up to four (4) bowling alleys for the use of the members of the club. . . ." Id.

It is clear from this examination of the zoning regulations that the dock improvements in the present case did not satisfy the definition of a yacht club because they included no land based component, such as a clubhouse. As previously discussed, Cook Road Extension is used only for access to the water and not as a location for any type of structure or destination with its own recreational focus apart from viewing the water or supporting the dock. This means that none of the accessory uses permitted in connection with a yacht club, such as a bowling alley, tennis court or swimming pool, is, or can be, accommodated on Cook Road Extension,

thus making classification of the dock improvements as a yacht club a legal impossibility.

The only remaining classification potentially applicable to the dock improvements is "[b]oat [s]torage [and] [r]epair," which is listed in table II in appendix A of the city's zoning regulations as a use limited to commercial and industrial districts only. We conclude, however, that the dock improvements in this case were not intended or designed for such a purpose, and, therefore, the zoning enforcement officer had no authority to regulate them under that provision. Accordingly, because the dock improvements, either by themselves or together with Cook Road Extension, do not satisfy the definition of a marina, a yacht club or a boat storage and repair facility, and because there was no harbor management plan in effect at the time the improvements were made, the zoning enforcement officer had no authority to regulate expansion of the dock.

The plaintiff claims that the use of a property for any purpose, riparian or otherwise, is subject to regulation under a permissive zoning scheme even if the activities are waterward of the mean high water line. We disagree. The cases on which the plaintiff relies are distinguishable from the present case because they involved situations in which the city or town in question, unlike the city in this case, had adopted a harbor management plan before the disputed improvements were constructed; see *DiPietro* v. *Zoning Board of Appeals*, supra, 93 Conn. App. 316, 318–22 (involving regulation of dock expansion by city of Milford pursuant to authority of harbor management plan approved by state department of environmental protection); or in which the governing regulations were substantially different from the Stamford zoning regulations. See *Port Clinton Associates* v. *Board of Selectmen*, 217 Conn. 588, 591–93, 587 A.2d 126 (involving regulation of building lines in waterway bordering town of Clinton pursuant to state

statute authorizing ordinance regarding establishment of building lines in certain waterways), cert. denied, 502 U.S. 814, 112 S. Ct. 64, 116 L. Ed. 2d 39 (1991); *Bloom* v. *Water Resources Commission*, 157 Conn. 528, 530–32, 536, 254 A.2d 884 (1969) (involving regulation of riparian rights by state water resources commission); *Poneleit* v. *Dudas*, 141 Conn. 413, 416, 106 A.2d 479 (1954) (involving regulation of structures on reclaimed land under 1949 Bridgeport ordinance providing that unzoned waters bordering city of Bridgeport that are filled in or subsequently built on "shall be deemed to bear the zoning classification of the adjacent zoned land").

The plaintiff further claims that the dock improvements are subject to zoning regulation because the intersection of the dock and Cook Road Extension is not located waterward of the mean high water line, either "vertically [or] horizontally." We agree that the intersection of the dock and Cook Road Extension is located precisely at the mean high water line but do not agree that the connection between the two is subject to the zoning regulations. This court stated in 1870 that, "in Connecticut the owners of land bounded on a harbor own only to [the] high water mark, and that whatever rights such owners have of reclaiming the shore are mere franchises. When however such reclamations are made the reclaimed portions in general become integral parts of the owners' adjoining lands. By means of such reclamations the line of [the] high water mark is changed and carried into the harbor . . . ." *Lockwood* v. *New York & New Haven R. Co.*, 37 Conn. 387, 391 (1870); accord *Poneleit* v. *Dudas*, supra, 141 Conn. 419. Thus, although there is substantial documentary evidence in the record to support the board's finding that the stone and concrete seawall was located waterward of the mean high water line, this finding was legally incorrect under *Lockwood*. As the plaintiff notes, the

dock intersects with Cook Road Extension *at*, instead of waterward of, the mean high water line because construction of the seawall before the dock expansion added reclaimed land to Cook Road Extension and changed the mean high water line from its former location behind the seawall to the seawall's face. The record contains no evidence, however, that the manner in which the new dock intersects with the seawall differs from the manner in which the old dock intersected with the seawall. Accordingly, the plaintiff has failed to establish any basis for zoning regulation of this portion of the dock improvements because, as in the case of Cook Road Extension, there appears to have been no change in the former and present use of the seawall.

The plaintiff also contends that, without city zoning authority over the dock improvements, the city is powerless to stop the owner of a dock from using it for casino gambling, adult entertainment or any other objectionable purpose. We disagree. Any proposed change in the use or configuration of the dock would require approval by the state because the dock lies over the waters of Stamford Harbor and would be subject to regulation through the state permitting process. Moreover, to the extent that the city's harbor management commission has since adopted, or intends to adopt, a harbor management plan, any such change would be subject to regulation by that commission. Thus, the implication of the plaintiff's claim that no regulations would apply to control potentially objectionable uses of the dock has no merit.

The plaintiff's final claim is that the board improperly determined that the city had no authority to regulate Cook Road Extension and the dock improvements because they constituted a "neighborhood dock," which is not a permitted use under the zoning regulations. This argument is also without merit. As noted previously, the board's factual findings and legal conclusions regarding

Cook Road Extension and the dock improvements were supported by the evidence and the applicable law. That the board used the term "neighborhood dock," which is not contained in the regulations, when describing the subject property in the certificate of decision is immaterial in light of these underlying findings and conclusions.

The judgment is affirmed.

In this opinion the other justices concurred.