******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# APPENDIX

## BERNARD W. NUSSBAUM ET AL. *v.* DEPARTMENT OF ENERGY AND ENVIRONMENTAL PROTECTION*

Superior Court, Judicial District of New Britain
File No. CV-18-6043337-S

Memorandum filed January 10, 2020

*Proceedings*

Memorandum of decision on plaintiffs' appeal from decision by defendant denying permit application to maintain fences and ordering removal of fences. *Appeal dismissed.*

*John P. Casey, Evan J. Seeman* and *Andrew A. DePeau*, for the plaintiffs.

*Sharon M. Seligman* and *David H. Wrinn*, assistant attorneys general, for the defendant.

*Opinion*

CORDANI, J.

## INTRODUCTION

This is an administrative appeal of a final decision of the Department of Energy and Environmental Protection (defendant) denying the permit application of Bernard W. Nussbaum and the Bernard W. Nussbaum Revocable Trust (collectively, plaintiff) and ordering the plaintiff to remove certain fencing previously installed by the plaintiff.

This amended decision is being provided in response to the plaintiff's motion for reconsideration and reargument. The plaintiff's motion points out several areas where the plaintiff considers the court's original decision to be unclear, and, as such, this amended decision clarifies those areas. However, the plaintiff's motion does not raise any issue that causes the court to substantively change its decision or the judgment entered. The perceived unclarity arises, primarily, merely from certain nomenclature used by the court but does not substantively affect the decision or the judgment. Accordingly, the plaintiff's motion for reconsideration and reargument is respectfully denied.

## FACTS AND PROCEDURAL HISTORY

The plaintiff owns property located at 100 and 104 Sea Beach Drive in Stamford (property). The property is adjacent to Long Island Sound. On its edge that is adjacent to Long Island Sound, the property line is defined by the mean high waterline, with the plaintiff's property ending on the landward side of the mean high waterline and property owned by the state of Connecticut as public trust on the waterward side of the mean high waterline. There is a seawall that generally runs parallel to the edge of Long Island Sound.

The plaintiff installed two fences. The date of the installation of the fences is not clear; however, it is clear that the fences were installed without a necessary permit from the defendant. The two fences separately run generally perpendicular to the seawall toward Long Island Sound. One fence is 24.5 feet in length, and the other is 27.5 feet in length. In 2002, the plaintiff, with the permission of the defendant, placed a small area[1] of large stones or riprap generally perpendicular to the seawall extending out into Long Island Sound. This area of riprap, placed by the plaintiff, is composed of large individual rocks with nothing, other than the ground on which they are placed, joining the rocks.

On July 16, 2012, the defendant issued the plaintiff a notice of violation for the two unpermitted fences and required that the fences be removed. The fences were not removed. On October 30, 2014, the plaintiff filed an after-the-fact permit application for the fences with the defendant. The defendant's staff issued a tenta-

tive determination to deny the plaintiff's permit application, and, on November 30, 2015, issued an order for the fences to be removed. The plaintiff timely requested hearings on both the permit application and the removal order. The matters were consolidated for hearing purposes. A public comment hearing was held on August 4, 2016, and an evidentiary hearing was held on October 6, 2016. The hearing officer issued his decision on April 21, 2017, recommending that the commissioner deny the permit application. A final decision was issued by the commissioner on February 6, 2018, affirming the denial of the permit applications and directing the hearing officer to finalize the removal order. The plaintiff has appealed the administrative action to this court.

The plaintiff is classically aggrieved because the final decision being appealed refused him a permit to maintain two fences and ordered him to remove the fences. Thus, specific legal issues, personal to the plaintiff and his property, are affected by the decision.

## STANDARD OF REVIEW

This appeal is brought pursuant to the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-183.[2] Judicial review of an administrative decision in an appeal under the UAPA is limited. See, e.g., *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 343, 757 A.2d 561 (2000). "[R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither [the Supreme Court] nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) Id.

Although the courts ordinarily afford deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes, "[c]ases that present pure questions of law . . . invoke a broader standard of review than is . . . involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 716, 6 A.3d 763 (2010).

## ANALYSIS

The fences in question cannot be lawfully installed and maintained without a permit issued by the defendant.[3] In order to be granted a permit, the fences must

generally comply with the statutes concerning structures, dredging and fill (General Statutes §§ 22a-359 through 22a-363) and the Coastal Management Act (General Statutes §§ 22a-90 through 22a-111).[4] In making a decision as to whether a permit should issue for these fences, the commissioner was required to consider and balance the private landowner's property rights with the state's and the public's interest and rights in land, which is held in public trust, to determine whether the structure, the fences in this case, unreasonably impair the public rights in view of the balance of rights.

The fences in this matter were installed, at least in part, for the purpose of inhibiting the access of the public to the beach area waterward of the mean high waterline.[5] As noted previously, areas waterward of the mean high waterline are owned by the state in trust for the public. The plaintiff sought to inhibit public access to the public trust adjacent to his property for several reasons. He found that inhibiting access lessened the likelihood that the public would trespass on his property. He found that accessing the rocky area adjacent to his property was unsafe for the public. Finally, he found that some members of the public, when accessing the public trust created a nuisance that inhibited his peaceful enjoyment of his adjacent private property. The foregoing property interests were asserted on the plaintiff's side of the balance.[6]

On the other side of the balance, the public has a right to access and use the public beach, rocky or not, which includes the area adjacent to the property waterward of the mean high waterline, provided that right does not include trespassing on private property. In fact, General Statutes § 22a-92 (c) (1) (K) states that, in permitting any new coastal structure, public access to and along the public beach below the mean high waterline must not be unreasonably impaired.

In balancing these interests and determining reasonableness, we first must consider the extent of the incursion by the fences into the public trust. Neither party disputes that at least a portion of each fence extends beyond the property owned by the plaintiff into the public trust. The parties only disagree about the extent of the incursion. The disagreement in this regard revolves around determining whether installation of the riprap shifted the mean high waterline.[7] Mean high waterline means the line where the arithmetic mean of the high water heights observed over a specific cycle (the National Tidal Datum Epoch) meets the shore. Thus, the mean high waterline is a fact to be measured for any particular piece of real estate. It is important because it determines the property boundary when private property borders the sea. For purposes of this appeal, it therefore determines the extent of the incursion of the fences onto public property.

The parties both agree that the mean high waterline,

and therefore the property line, was at the waterward face of the seawall in the area of the fences prior to installation of the riprap. The plaintiff argues that installation of the riprap moved the mean high waterline farther into the sea. The defendant disagrees. It is clear that changes to the land may shift the mean high waterline. In both *Lockwood* v. *New York & New Haven Railroad Co.*, 37 Conn. 387, 391 (1870), and in *Rapoport* v. *Zoning Board of Appeals*, 301 Conn. 22, 49–50, 19 A.3d 622 (2011), our Supreme Court accepted that, changes to the land, either natural or man-made, which amount to either land reclamation or erosion, may change the mean high waterline. Thus, it is clear that changing the mean high waterline is theoretically possible. The question is, did the installation of the riprap change the mean high waterline in this case. The commissioner found that it did not. The court finds that this conclusion is supported by substantial evidence in the record, is not a clear error of law, is not arbitrary and capricious, and is not an abuse of discretion.

The riprap is a series of large rocks running perpendicular into the sea. Nothing connects the rocks other than their placement on the ground. Seawater flows around the rocks and within the riprap. The tidal waters reach the face of the seawall, even directly behind the riprap. As such, the riprap does not stop the seawater from reaching the seawall with each tide. Nearly all of the rocks composing the riprap are submerged at high tide. These facts substantially support the commissioner's finding that the mean high waterline did not change in this case.[8] The commissioner understood that the mean high waterline could theoretically change based on physical changes to the land but found in this case that the riprap did not in fact change the mean high waterline because of the physical attributes of the riprap and its physical interaction with the sea, and, as such, the riprap did not amount to reclaimed land.[9]

The foregoing conclusion means that, essentially, all of the fences are on land owned by the state in trust for the public.[10] As noted previously, the purpose of the fences is to restrict public access to areas within the public trust.[11] The record evidence indicates that the fences have in fact been significant deterrents to public access.[12]

In balancing the property rights of the plaintiff against the rights of the state and public to access the public trust,[13] the commissioner considered the following private property rights: (i) right to quiet enjoyment, (ii) right to be free from private nuisance, (iii) right to be free from trespass, and (iv) the right to be free from lawsuits for injuries sustained by the public.[14] In balancing these rights against the right of public access to the public beach, the hearing officer found that each of the foregoing private property rights can be exercised without the need to deter or constrain public access to

the land of the public trust. The right to be free from trespass on the plaintiff's private property may be exercised by placing a fence on the private property line within the private property of the plaintiff,[15] as opposed to extending a fence onto the public trust. The right to quiet enjoyment and to be free from nuisance can be asserted by contacting and cooperating with the public authorities in the enforcement of existing law.[16] The right to be free from lawsuits for injuries occurring on the plaintiff's private property may be asserted by placing a fence on the edge of his property, placing appropriate signs and/or contacting and cooperating with the authorities in the enforcement of existing law. Accordingly, the hearing officer found that the exercise of the plaintiff's private property rights did not justify placing a fence on public property when balanced against the right of the public to have access to the public property. This court finds no fault in the hearing officer's analysis and balancing, for it would be quite an unusual circumstance for one person's private property rights to extend as far as placing a fence on someone else's property for the very purpose of deterring access by the other owner to their own property.

The hearing officer correctly noted that the aforementioned private property rights asserted by the plaintiff concerned the use of his "upland property," meaning the property whose title is actually owned by the plaintiff. Thus, the hearing officer properly considered this in his balance of rights, ultimately concluding, as noted, that the rights asserted did not justify the fences' interference with the public's right to access the public trust.

Although not frontally asserted by the plaintiff, the hearing officer also considered and contrasted the plaintiff's littoral rights, which, as a shore property owner, do authorize him to use the intertidal area, subject to the applicable statutes and regulations, and subject to the public's rights. These rights are ancient common-law rights that are subject to a balancing against the public's right to access the public trust. Thus, littoral rights include the right to wharf out into the water, and to build a pier, dock or other structure whose purpose is to facilitate the coastal landowner's access to and use of the water. These rights are not absolute and have been properly regulated. Here, the hearing officer compared those rights to the plaintiff's desire to place the fences. The hearing officer properly noted that, when authorization is given to construct wharfs, piers and other structures, the authorizations always seek to ensure that the structure does not unreasonably impair the public access. In this case, the very purpose, intent and function of the fence is to impair the public's access. Accordingly, the comparison further justified the hearing officer's rejection of the plaintiff's permit application.

The plaintiff takes the commissioner to task on sev-

eral primary points. First, the plaintiff asserts that the commissioner's failure to find that the installation of the riprap moved the mean high waterline is inconsistent with *Lockwood* and *Rapoport*. Such is not the case. Clearly, the common law, and the foregoing two cases, recognize that natural and/or man-made structures or action *may* change the mean high waterline. However, whether the mean high waterline has in fact changed is primarily a fact question to be measured and assessed. Here, the commissioner considered the riprap and reasonably concluded, with substantial evidentiary support in the record, that the riprap had not changed the mean high waterline.[17]

Second, the plaintiff claims that the commissioner did not consider all of the plaintiff's property rights in conducting the balance. The plaintiff complains that the commissioner only considered the plaintiff's littoral rights. Such is clearly not the case. The commissioner considered all of the property rights asserted by the plaintiff, as reflected in the April 21, 2017 decision. In this court's view, the commissioner considered and balanced all rights asserted by the plaintiff but arrived at the reasonable conclusion that the plaintiff's rights did not justify the incursion of the fences into the public's right of access. The court finds no clear error in this conclusion. In this regard, the commissioner properly considered and weighed the fact that the very purpose, intention and function of the fences is to impair public access to the public trust.[18]

The plaintiff asserts that the fences are also meant to protect the public, essentially, from itself. In this regard, the record indicates that the groin is slippery and that fishermen have gotten surrounded by the incoming tide when fishing on the groin. See footnote 1 of this opinion. Despite the foregoing, the plaintiff is not in a position to place a fence on public property even if it would function to protect the public by impeding its access to a dangerous area. Decisions to protect the public on public land are best left to the public itself and/or to the government.

CONCLUSION

Given the standard of review in this administrative appeal, and given the factually intensive determinations of determining the mean high waterline and then balancing the private property interests against the public's interest in access to the public trust land, the court finds that the record contains substantial evidence to support the commissioner's conclusions,[19] and the conclusions reached are reasonable. The court finds no clear error of law and no abuse of discretion in the underlying decision to deny the permit application and require removal of the unpermitted fences.

ORDER

The plaintiff's motion for reconsideration is denied.

The appeal is dismissed.

* Affirmed. *Nussbaum* v. *Dept. of Energy & Environmental Protection*, 206 Conn. App. 734,    A.3d    (2021).

[1] This area of stones, placed by the plaintiff, is referred to by the plaintiff as riprap and extends perpendicularly outward from the face of the seawall into the Sound. There is also a stone peninsula referred to as a "groin" in the applicable technical terminology, which also extends perpendicularly into the Sound.

[2] General Statutes § 4-183 (j) provides in relevant part: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law: (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. . . ."

[3] Both the plaintiff and the defendant agree that at least some portion of the fences extend beyond the private property boundary of the plaintiff into land owned by the state in public trust. The parties only disagree about the extent of the incursion. Both parties agree that a permit from the defendant is necessary to install and maintain the fences. Each of the fences is within the defendant's permitting jurisdiction because they are waterward of the coastal jurisdiction line, which runs along the waterward face of the seawall.

[4] The parties agreed that the fences do not cause an adverse environmental impact and, thus, focused on balancing the plaintiff's asserted property rights against the right of the public to access the public trust (i.e., land waterward of the mean high waterline) to determine whether or not the public's access to the public trust was unreasonably impaired.

[5] The permit application for the fences states that their purpose is to "deter the general public from using the immediate area around a rock strewn jetty which becomes [covered] by high tide waters. . . . The fences do not completely prohibit public access, but provide a visible barrier and warning [that, in the opinion of the applicant, the area] is unsafe and not monitored. There are other more safer areas nearby that the public could use for fishing." It should be noted that the "rock strewn jetty" referred to is part of the public trust.

[6] Although not directly asserted, a landowner bordering water has a right to wharf out into the water subject to reasonable regulation and subject to the public's right to access to the public trust.

[7] The permit issued for installation of the riprap noted that the authorization to install the riprap "conveys no property rights in real estate or material, nor any exclusive privileges, and is further subject to any and all public and private rights."

[8] The plaintiff's expert (Raymond L. Redniss) testified that the installation of the riprap did not change the mean high waterline for property boundary purposes but did change it for permitting purposes. This argument makes no sense. The mean high waterline is a fact that is measured. It cannot have two disparate answers. The defendant's expert (Brian D. Florek) testified that the mean high waterline remained coincident with the waterward face of the seawall in the area of the fences, and that the riprap was not a solid [or continuous] surface, and, as a result, could not move the mean high waterline. Given Florek's evidence, it is clear that the commissioner's finding is supported by substantial evidence in the record.

[9] In his final decision dated February 6, 2018, on page 8, the commissioner states: "Hearing Officer [Brendan] Schain found that the placement of the riprap *did not create the type of "reclamation"* that could result in a permanent accession to Mr. Nussbaum's property because water continues to flow over and around the riprap to the base of the seawall." (Emphasis added.) The hearing officer found that the riprap was not a continuous solid surface and, as such, the placement of the riprap did not constitute reclamation and did not move the mean high waterline. Thus, the commissioner, and the hearing officer, understood that reclamation could theoretically occur; however, they factually found that placement of the riprap was not reclamation and did not move the mean high waterline because of the physical

attributes of the riprap and its interaction with the sea. Surveying expert Brian D. Florek agreed and testified as such, clearly providing substantial evidence in support of the foregoing findings by the commissioner and the hearing officer.

[10] However, regardless of the analysis of the riprap and the mean high waterline, a portion of the fences extends into the public trust, and the plaintiff has not asserted any property right which would justify his placing a fence on public land with the very purpose and function of impeding the public's access to its own land.

[11] There are about eight to ten feet between the end of the fences and the mean low waterline.

[12] The plaintiff himself confirmed this fact in his testimony concerning aggrievement at the hearing in this matter.

[13] The public has a right to access the land extending from the mean high waterline waterward to the water, although this right of access does not include a right to trespass on private property. In this area it is possible for the public to access the public trust without trespassing on the private property of the plaintiff.

[14] See April 21, 2017 hearing officer decision on page 10, first paragraph. The commissioner also considered the plaintiff's right to wharf out into the water.

[15] The plaintiff previously had such a fence, but it was destroyed in a hurricane. The plaintiff has not sought permission to reconstruct such a fence within the bounds of his private property.

[16] The type of nuisance complained of by the plaintiff, such as litter, cannot justify the draconian remedy of preventing the public from accessing its own land, particularly when less drastic and more typical means of addressing the issue are available.

[17] The plaintiff correctly points out that the mean high waterline is determined by elevation measurement, measuring where the water intersects the shore. However, the plaintiff ignores the issue that the finder of fact must determine—whether a specific structure, such as the riprap, constitutes land or the shore. Here, the commissioner determined, as supported by the evidence of surveying expert Brian D. Florek, that the riprap was not a continuous solid structure and did not amount to reclamation.

[18] Contrary to the plaintiff's assertions, the commissioner did not seek to maintain a policy of denying all structures, other than docks and piers, below the mean high waterline. Instead, the commissioner properly balanced the asserted private property rights against the public's right to access to the public trust and reached a conclusion that these two fences failed in the balance.

[19] The commissioner adopted the decision of the hearing officer as his own.

--------------------------------------------